LOTTINGER, Judge.
This is a compensation proceeding wherein the plaintiff claims to have been totally and permanently disabled as a result of an accident which occurred on May 1, 1952. It is alleged that on that day, while in the employ of Clem A. Mays Company (or CAMCO), the defendant’s insured, as a common laborer, he suffered injuries to his left hand consisting of “contusion to the terminal phalanges of the left second, third and fourth fingers, and fractures of the terminal phalanx of the left index finger and avulsion of nails of the second and third fingers of said hand.”
*632 The defendant first filed what it styled an “exception of no right or cause of action or of vagueness” whereupon the plaintiff -amended his petition averring that at the time of the accident he was receiving an average weekly wage of $50. The defendant then answered, admitting the hazardous nature of the employer’s business and of the plaintiff’s duties together with the occurrence of the accident. It denied, however, that the plaintiff had been permanently and totally disabled and averred that it had paid plaintiff compensation from May 2, 1952, to December 12, 1952, at the rate of $26 per week, or a total of $832, plus expenses for medical treatment in the amount of $215.
The case was duly tried on its merits in the court below on June 10, 1953, and following a judgment rendered on August 21, 1954, dismissing the suit the plaintiff has appealed to this court.
At the trial in the court below the plaintiff caused to be placed on the stand only three witnesses, i. e., himself, Aurelias Broussard and Carlton Simpson. He introduced no medical testimony whatever and the defendant’s witnesses consisted of two doctors, namely Dr. Harold M. Flory and Dr. James Gilly.
It appears from the testimony of the plaintiff that his hand was injured while he was “dumping pipes to pass them through the cleaning machine” when one of them' got caught and rolled over his hand. He testified that he was, in effect, a common laborer and that subsequent to the injury of May 1, 1952, he has not been able to engage in the same type of work. According to his testimony, the reason for his disability is that his hand will swell and he suffers pain in both the hand and wrist. In addition, he stated that his fingers were numb and that he could not lift anything, heavy. On cross-examination he stated that even when not using the hand he felt little pulsating pains in it, and that when he attempted to work he would experience pain up to and above the elbow joint. The plaintiff related further that he had attempted to work since the accident and did work for two days but that after the third day his hand was so- swollen his employer let him go. This, apparently, was his only attempt at other employment and took place approximately a month or so previous to the trial on June 10, 1953.
The witness Aurelias Broussard who testified on behalf of the plaintiff only related the occurrence of the accident and the fact that the plaintiff had worked for his employer some two months previous to the accident. He did not testify with respect to plaintiff’s alleged disability and his testimony is, therefore, of no value in resolving that point.
The only other witness called on plaintiff’s behalf was one Carlton Simpson, foreman for the Bonnet Roofing Company, for whom he had worked a month or so previous to the trial in the Court below. This witness corroborated the plaintiff’s testimony with respect to this job in stating that on the third day he told him he “couldn’t hire him because his hand was swollen.”
Dr. Harold M. Flory, general practitioner of New Iberia, who testified on behalf of the defendant, stated that he treated the plaintiff on the day of the injury at which time he X-rayed his hand, which showed a “fracture of the terminal phalanx of the index finger.” A second X-ray showed a “chipped fracture of the terminal phalanx of the ring finger.” He stated further that the nails were knocked off of the index and middle fingers and there were superficial lacerations of these fingers. The treatment administered by Dr. Flory consisted of dressing the lacerations and raw surfaces where the nails had been together with splinting the fractures. There was no marked displacement of the fractured area and he -gave no reduction. He last saw the plaintiff on June 26, 1952. Without going into unnecessary detail concerning the testimony of Dr. Flory we think it significant to point out that under cross-examination, he stated unequivocably that “I consider the man can do-manual labor again, what he was doing before.”
Dr. James'Gilly, whose deposition was taken on behalf of the defendant, testified *633 that he first saw the plaintiff on July 28, 1952, and thereafter at regular intervals until November 25, 1952, at which time he was discharged. His last examination was made on June 11, 1953, the day before his deposition was taken. His findings upon the first examination were as follows:
“A. At the time of the initial examination he stated that he had received an injury to the left hand approximately three months before that examination. He stated that he was lowering a pipe into a cleaning machine when the pipe rolled backwards catching his left hand between the pipe and an iron lever. He received injuries to the three radial fingers of his left hand and this was a crushing type of injury. He stated that he received a fracture of his index finger and that the great and ring fingers were severely bruised. He stated that he had received treatment and was discharged and returned to work in approximately six weeks. At the time of the physical examination he was complaining of stiffness in his fingers and his wrist which he states is more marked in the morning and gradually decreases as the day progresses. However, he stated early in the morning he must soak his hand in warm water before he can obtain freedom of motion. He was complaining of pain localized to the radial side of the wrist over the distal end of the radius proper. The patient stated that he is right-handed.
“Physical examination of the left elbow, ‘ shoulder and wrist show normal range of motion with excellent power. Inspection of the left hand reveals the following facts: The nails of the index, great and ring fingers are dead and are gradually being replaced by new nails which are growing from beneath. This replacement is not quite complete as yet and the stubs of the nails are not freely movable and are quite painful at this time.
“Physical examination of the thumb fails to reveal any abnormal findings. The little and ring fingers wére likewise considered to be normal in range of motion and power. The following facts were noted by the examination of the index and great fingers of the left hand: the motion in the metacarpal phalangeal joint, is considered normal. Motion of the proximal interphalan-geal joints of both fingers each lack approximately ten degrees of full flex-ion. The motion in the distal inter-phalangeal joints of these two fingers lack approximately 25 percent of full flexion. The patient is able to oppose the thumb to all four fingers of the hand. In flexion the little and ring fingers can be made' to touch the fat pad at the metacarpal heads. The index and great fingers lack approximately one-half inch of touching the fat pads. -
“The skin color and temperature were considered normal and there was no disturbance of perception to pin prick and light touch noticed on this examination.
“The patient was referred to Drs. Miles and Ramogosa of Lafayette for x-ray studies of the wrist and fingers of the left hand. The x-rays of the left wrist failed to reveal any abnormal findings. The x-ray of fingers of the left hand shows only a slight longitudinal healing fracture of the distal phalanx of the index finger. This does not include the joint. At the time of that examination I stated that the patient showed definite disability to return to work due to the fact that the fingernails were still present and were slowly being replaced.”
With respect to further treatment this doctor testified as follows:
“Q. Now, Doctor, as I understood you, you continued to treat this man after July 28th? A. That is right.
“Q. And I will ask you to state how he progressed under your treatment? A. Well, by the time of the next visit in September the nails had *634 fallen off; the nails had not been completely replaced and he still complained of soreness and stiffness in the three radial fingers, meaning these three fingers on this side of the radius.
“Mr. Simon: You mean the mid, index and ring fingers?
“The Witness: Yes, sir.
“By Mr. Dubisson:
“Q. Please proceed. A. And, after the fingernails had fallen off there was still some residual stiffness of the finger joints, so they were given a course of diathermy treatment which is deep heat and manipulation of the fingers in the office, plus exercises to do at home. And this was continued until November the 25th and at that time the patient had regained full motion and could make a complete fist. Still complained of some weakness to the left arm and muscles of the left arm showed definite flabbiness which we contributed to the fact that he had undergone treatment and was unable to use his hand in the normal manner. The examination at that time showed that the proximal interphalangeal joints of the index and large finger were, slightly fusiformly enlarged. There was no tenderness present over those joints. There was some tenderness present in the fat pads of both fingers, that is, the large or great and index fingers. The fingernail on the right index finger shows some slight residual deformity in the presence of'a transverse ridge which is gradually growing out. It was my impression that the cause of the tenderness, and I thought that it would subside when the nail grew out, and the ridge could be cut off in the normal process of cutting your fingernails. Sensation to the left hand was normal at that time. It was my impression that the patient had obtained maximum benefits of the treatments and would be'able to return to work. .1 thought that there would be a disability to the left hand of about ten percent loss of dexterity and endurance which would represent approximately a ten percent loss of function of the left hand only, and I believed that this residual would be permanent. However, I did not feel that since this patient was handling large pipes that the disability would interfere with his efficient performance of his usual occupation.”
Counsel for plaintiff stresses the fact that Dr. Gilly found a ten per cent loss of dexterity and endurance. That this did not, however, disable the plaintiff is shown by the opinion expressed by him as follows:
“Q. Now, doctor, I will ask you this question: When you last saw this man in November of 1952, that was November 25th, what was your opinion as to his ability to perform the type of labor that he told you that he was performing when he was hurt? A. I thought that he could do it.
“Q. And, Doctor, when you saw him yesterday, what was your opinion as to his ability to do the kind of work that he described to you that he was doing at the time he was hurt? A. I think that he could do it.”
From the above and foregoing we are completely satisfied that the plaintiff has failed to prove his case. The medical testimony is entirely against him and his own testimony with respect to his one attempt to resume work is insufficient to show the disability complained of. Counsel for plaintiff places great reliance on the case of Scott v. Fulton Bag and Cotton Mills, La.App., 65 So.2d 397. A reading of that case, however, discloses that it is not apposite here as several doctors testified that she was totally and/or permanently disabled in doing her wqrk. Such is not the cage here.
Finding no manifest error in the judgment appealed from the same is hereby affirmed.
Judgment affirmed.