500 So.2d 888 (1986)
UNIVERSITY PROPERTIES CORPORATION, et al.
v.
FIDELITY NATIONAL BANK OF BATON ROUGE.
No. CA 85 0411.
Court of Appeal of Louisiana, First Circuit.
December 23, 1986.
*889 George L. Clauer, III, Baton Rouge, for plaintiffs-appellants University Properties Corp. and Fred C. Frey.
Ralph E. Hood, Baton Rouge, for defendant-appellee Fidelity Nat. Bank of Baton Rouge.
Before GROVER L. COVINGTON, C.J., and LOTTINGER, EDWARDS, WATKINS, SHORTESS, CARTER, SAVOIE, LANIER, CRAIN, ALFORD, JOHN S. COVINGTON and LeBLANC, JJ.
LANIER, Judge.
This action commenced as a suit for a declaratory judgment by the maker and surety of a promissory note alleging the obligation was null because it was obtained in violation of the Louisiana Deficiency Judgment Act (LDJA), La.R.S. 13:4106 et seq.[1] The holder of the note answered and *890 reconvened for judgment on the note for (1) $36,398.83, with interest thereon at the rate of 14% from March 9, 1984, until paid, (2) unpaid accumulated interest of $706.04, (3) an attorney fee of 25% of the principal and interest due, and (4) all costs. The parties filed cross motions for summary judgment. After a hearing, the trial court rendered judgment (1) dismissing the motion for summary judgment filed by the maker and the surety, (2) granting summary judgment in favor of the holder as prayed for, except the assessment of a reasonable attorney fee was reserved for a subsequent hearing, and (3) dismissing the suit for declaratory judgment with prejudice. The parties waived the hearing to fix the attorney fee and submitted the matter on affidavits. The trial court fixed the attorney fee at $5,000. The maker and surety took this devolutive appeal.

FACTS
On November 16, 1981, University Properties Corporation (University) executed two promissory notes, each in the sum of $72,800 (a total of $145,600). These notes were secured by construction mortgages in favor of Fidelity National Bank of Baton Rouge (Fidelity) on Lots 5H1 and 5H2 of Sharlo Subdivision in East Baton Rouge Parish, Louisiana. The mortgage hand notes were secured by the personal guarantee of University's President, Fred C. Frey, Jr.
University completed construction of homes on each lot in August of 1982. University attempted to sell each property for $81,500. University had individual offers of $79,000, $79,500 and $80,000, but these offers did not mature into sales because of difficulties in obtaining financing.
By June of 1983, the two lots were not sold and University was in arrears in payments on the two construction notes. On June 30, 1983, Fidelity wrote to University's president, Fred C. Frey, Jr., advising that the loans had matured and, as of that date, $145,600 in principal and $21,451 in interest (a total of $167,051) was owed on the obligations. Fidelity "strongly" suggested that the interest be brought current in ten days and that University consider "reworking the terms of the remaining debt." On July 28, 1983, University executed a promissory note in favor of Fidelity for $168,849.52, which note was payable eighty-one days after date (October 17, 1983). Frey personally guaranteed payment of this note.
On January 10, 1984, University (represented by Frey) entered into a new agreement with Fidelity. This agreement is entitled a dation en paiement (dation) and act of cancellation. This agreement recites the following: (1) University was indebted to Fidelity for $168,849.52 with interest thereon *891 from July 28, 1983, and this obligation was past due; (2) this indebtedness was represented by a promissory note which was secured by the pledge of the two construction notes; (3) University was unable to pay the note; (4) to satisfy this obligation, the parties agreed that University would make a dation by transferring to Fidelity the ownership of the two lots and a $36,398.83 promissory note executed by University and personally endorsed by Frey; and (5) the $168,849.52 obligation was discharged and the note representing same, along with the two construction notes and the construction mortgages, were cancelled. In this transaction, University was given a credit of $140,000 for the value of the two lots. The new note represented the balance of principal and interest due. The record does not reflect that an appraisal of the lots was made prior to the execution of the agreement.
On February 3, 1984, Fidelity sold the two lots for $140,000. On February 20, 1984, Constance Rhodes Harris issued an appraisal to Frey which valued the two lots at $160,000. Neither Frey nor University made any payments on the new note. This suit was filed on February 27, 1984.
The foregoing facts were established primarily by the documentary evidence submitted by the parties. The parties also submitted the depositions of Thomas W. Chiasson, an officer in Fidelity's Special Loans division, Frank R. Clark, Fidelity's Senior Vice-President in charge of Loan Administration, Special Loan division, and Frey. The depositions establish the following additional facts.
Chiasson testified he directed Jim Smolenski to send the Fidelity letter of June 30, 1983, to Frey. Frey came in pursuant to the letter, the consolidated note was executed and the loan date extended to October 17, 1983. After the new maturity date had passed and payment was not forthcoming, Fidelity considered a foreclosure proceeding with a subsequent deficiency judgment against Frey personally. Frey's financial statement indicated he had a house. Chiasson did not recall discussing this alternative with Frey. This loan was turned over to Clark, who was Chiasson's superior.
Clark testified he became involved with University's consolidated note after it was in default. Fidelity was ready to proceed legally. Frey apparently had talked to other persons at Fidelity who asked Clark to discuss the matter with Frey. Clark called Frey and set up a meeting. During several meetings, Clark discussed various alternatives with Frey. The first alternative was a suit by Fidelity against University and Frey. Frey responded that this might put him in bankruptcy. A second alternative was for University to sell the two mortgaged properties and apply the proceeds to the debt. Frey said he did not think he could sell them for what he owed the bank. Clark suggested that the two mortgaged properties could be set up on a separate loan to give University time to sell them, and Frey could give a note secured by a third mortgage on his home with only interest due until the lots were sold. Frey rejected this alternative. Clark discussed a dation with Frey. Frey advised he wanted to talk to his attorney again about filing bankruptcy. About a week later, Frey returned, advised he had talked to his attorney and said the dation was agreeable to him. Clark advised Frey that $140,000 was a correct value for the properties. Frey seemed to agree to that. Frey agreed to sign a note for the balance due on the loan. Clark said, "we had a couple of people that were interested in the properties and Mr. Frey said that he did not want to sell the properties, that he wanted to go through with the dation and the note and let the bank worry about selling the properties." Only interest payments would be required on the new note for the first year and, thereafter, a payment schedule for the principal would be set up. Frey indicated he had a project "across the river" with which "he would make sufficient income there to be able to either pay us off or either put us on a repayment schedule." At some point in time, the persons who bought the properties from Fidelity contacted Fidelity and were referred to Frey. *892 However, no action was taken. After the dation was completed, these persons came back to Fidelity and the sale of the properties to them was passed. Fidelity financed the transaction for one year at the base rate. Fidelity had other offers for the properties, but the one accepted was the best.
Frey testified that on July 28, 1983, the two construction loans were in arrears and he was unable to make the interest payments. Chiasson contacted Frey about the loans, and Frey told him he was unable to pay. Chiasson agreed to extend the loan to give time to sell the properties. Frey was unable to sell them during the extension. In November of 1983, Chiasson called Frey and told him he had to pay. Frey told Chiasson he was unable to do so and that he "needed some help from the bank in the form of creative financing." Chiasson said the only alternative was foreclosure. This upset Frey, and he went to see Don Gerald (apparently of Fidelity), told Gerald of his situation and asked if he "could get some help on some creative financing." On the Monday or Tuesday after Thanksgiving in 1983, Chiasson called Frey and told him Fidelity was going to proceed with the foreclosure and explained the foreclosure and deficiency judgment scenario. That frightened Frey, so he sought legal advice. The attorney he consulted advised that his only recourse was Chapter 11 bankruptcy and referred him to another attorney. Frey met with the second attorney and explained his situation. Around December 1, 1983, Frey went to see Clark and Chiasson, still seeking "creative financing." At this meeting, the term "dation" came up. Frey's attorney explained it to him. The bank only wanted to give $130,000 for the property. Frey did not think this was enough. At that time, the only viable solutions seemed to be foreclosure or bankruptcy. Frey decided to go bankrupt and commenced the preliminary paper work with his attorney. At this time, University was involved in a joint venture "across the river." This joint venture was the only source of income to pay the balance due on the loan. If University took bankruptcy, it would probably cancel the joint venture. (Frey felt this way after discussing the problem with the joint venture partners.) About this time, Frey met again with Clark and they agreed to a value of $140,000 for the properties in a dation. The dation and the note for the balance of the loan were executed on January 10, 1984. Frey intended to pay the new note by selling his house. Around the end of January 1984, Frey got some legal advice that the new note was not valid, and so he did not pay the interest due on it.

APPLICABILITY OF THE LOUISIANA DEFICIENCY JUDGMENT LAW TO A PARTIAL DATION EN PAIEMENT
University and Frey contend the trial court committed error by "failing to apply the Deficiency Judgment Act so as to void the note given by University Properties Corporation for the balance claimed due after surrender of the mortgaged property to Fidelity."

History of and Rationale for the LDJA
In Comment, Deficiency Judgments in Louisiana, 49 Tul.L.Rev. 1094, 1094-1095 (1975), the history of and rationale for the LDJA is discussed as follows:
A deficiency judgment is a judgment rendered in favor of a creditor for the difference between the amount of a debt and the amount realized in a judicial (public) sale held for the satisfaction of that debt. The rules governing deficiency judgments in Louisiana are set forth in two articles of the Code of Civil Procedure, articles 2771 and 2772, and two revised statutes, La.R.S. 13:4106 and 4107 (the Deficiency Judgment Act). Prior to the enactment of the Deficiency Judgment Act, most mortgage instruments in Louisiana contained a waiver of appraisement. When property values were depressed and the economy was recessionary, the mortgagee foreclosing on the property could commonly buy it at public sale for a low price. The low return on the sale would allow the mortgagee *893 to obtain a personal judgment against the mortgagor for a greater amount than if there had been appraisement and its accompanying safeguards. Thus, the mortgagor could have other property seized and sold in satisfaction of the personal judgment. The Act remedies this inequity.
The Deficiency Judgment Act first appeared in our law as Louisiana Act of 1934, No. 28 and was amended in 1952. The Act requires an appraisal prior to judicial sale if the creditor is to preserve his right to pursue the debtor for any unsatisfied portion of the claim. The first sale may be consummated only if the bid price equals at least two-thirds of the appraised value. If two-thirds cannot be obtained, a second sale is held in which the property is sold for whatever price it will bring. Because a deficiency judgment is a harsh remedy, the courts generally have held that the requirements of every step leading to the deficiency judgment must be complied with strictly.
[Footnotes omitted.]
In Note, Louisiana Practice-Deficiency Judgment Act-Applicability to Surety on Mortgage Note, 14 La.L.Rev. 285, 285-286 (1953), appears the following:
The Louisiana Code of Practice requires an appraisal of property prior to judicial sale. If at the sale the highest bid does not equal or exceed two-thirds of its appraised value, there can be no valid adjudication of the property. The ability of the mortgagee to bid the property up to the amount of the mortgage indebtedness, without requiring any cash outlay except for the relatively small sum due for costs, serves effectively to discourage competitive bidding by third parties. However, at least in theory, the requirement that the property be sold for not less than two-thirds of its appraised value affords a considerable measure of protection to the mortgagor. Normally, under this requirement the proceeds realized from the judicial sale reduce the mortgage indebtedness to less than a third, and accordingly limits any subsequent deficiency judgment obtained against the mortgagor. In normal times, these theoretical safeguards work reasonably well. In periods of financial stress, when property values are depressed appreciably, the requirement that the property bring two-thirds of its appraised value offers less effective protection to the mortgagor.
[Footnotes omitted.]
Failure to comply with the LDJA effects a full and final discharge (extinguishment) of the debt obligation to which it applies. Rushing v. Dairyland Insurance Company, 456 So.2d 599 (La.1984).

Distinction Between a Sale and a Dation
At this point, it is appropriate to discuss the distinctions between a sale and a dation. A sale is an agreement by which one gives a thing for a price in money, and the other gives the price to obtain ownership of the thing. La.C.C. art. 2439. A dation (giving in payment) is an act by which a debtor gives a thing to the creditor, who is willing to receive it, in payment of a sum which is due. La.C.C. art. 2655. In a sale, the ownership of the thing is transferred upon the mutual consent of the parties; in a dation, ownership is transferred by delivery. La.C.C. art. 2656; Quality Finance Co. of Donaldsonville, Inc. v. Bourque, 315 So.2d 656 (La.1975). However, unilateral delivery of property by the debtor to his creditor will not perfect a dation; there must be consent by the creditor. Fruehauf Trailer Division, Fruehauf Corp. v. Toups, 243 So.2d 88 (La.App. 1st Cir.1970). In a sale, the consideration (cause) for the transaction is the money; in the dation, the consideration (cause) is the remission of the preexisting indebtedness. A perfected dation ordinarily will extinguish the entire debt. Orgeron v. Griffin, 230 So.2d 838 (La.App. 1st Cir.1970); St. Landry Credit Plan, Inc. v. Darbonne, 221 So.2d 880 (La.App. 1st Cir.1969). In this situation, there can be no valid suit for a deficiency judgment because the entire *894 obligation has been extinguished by the dation. However, parties validly may enter into a dation for a partial remission of the debt obligation. Dunaway v. Spain, 493 So.2d 577 (La.1986). A debtor can give unencumbered property to his creditor in a partial dation, and there will be no violation of the LDJA because the LDJA only applies to encumbered property. However, where, as in the instant case, the partial dation involves a transfer of the mortgaged property from the debtor to the creditor, coupled with a new note for the balance, a question of the applicability of the LDJA is presented. In Comment, Deficiency Judgments in Louisiana, 49 Tul.L.Rev. at 1101-1102 appears the following:
Numerous attempts to circumvent the Deficiency Judgment Act have been struck down by the courts. Creditors have unsuccessfully attempted to recover on promissory notes which were given by debtors to cover the difference between the value of the mortgaged property and the amount obtained in the sale. The debtor's unilateral surrender to the creditor of the mortgaged property does not preclude recovery of the entire indebtedness provided that other procedural requirements are satisfied. The creditor's voluntary acceptance of the mortgaged property, however, has been construed as a dation en paiement settling the indebtedness and barring a deficiency judgment. A trade-in of a mortgaged car for an older car, however, at the instigation of the mortgagor has been held not to constitute a method of repossession by a finance company; the mortgagee could by this method obtain the effect of a deficiency judgment for the difference between the amount due on the initial note and the value of the older car. The jurisprudence also indicates that the release of part of the mortgaged property by the mortgagee, so that the mortgagor could sell this property to a third party, would not prohibit the creditor from obtaining a deficiency judgment. According to the Act, and the jurisprudence thereunder, a sale without appraisement of a portion of the mortgaged property would not preclude a deficiency judgment. The entire thrust of the jurisprudence in this area has been to protect the debtor from an overbearing creditor while allowing the creditor to be lenient with the debtor without losing his right to a deficiency judgment.

[Emphasis added.]
[Footnotes omitted.]
In Note, Pledge  Non-judicial Foreclosure Sale  Purchase by Pledgee  Application of the Deficiency Judgment Act to Pledge, 27 Tul.L.Rev. 490, 493-494 (1953), appears the following:
However, it would seem that even though the Deficiency Judgment Act precludes the pledgee from suing for the deficiency of the debt which remains unsatisfied after sale of the pledged property without appraisement, there is no statutory provision which prohibits a pledgor and pledgee from making an agreement, at a time subsequent to the date on which the debt matures, transferring ownership of the pledged property in total or partial satisfaction of the indebtedness and subject to the pledgee's retention of a right to collect the unpaid balance of the indebtedness from the pledgor.

Initial Jurisprudence of the Courts of Appeal Under LDJA
Although, facially, the LDJA only applies to judicial sales, the jurisprudence has extended its protections to private sales.[2] In Home Finance Service v. Walmsley, 176 So. 415 (Orleans 1937), the debtor borrowed $300 from the creditor and executed a promissory note secured by a chattel mortgage *895 on his automobile. At the same time, the debtor executed a collateral contract with the creditor which transferred title of the automobile to the creditor and provided that should the debtor default he would deliver possession of the chattel to the creditor who was authorized to sell it at a private sale. The debtor subsequently defaulted and turned the chattel over to the creditor who sold it, applied the sale price to the debt and then filed suit against the debtor for the $128.30 balance that remained due. In affirming the dismissal of the creditor's claim, the court observed as follows:
It is clear from the foregoing that it has been declared to be against the public policy of this state for any holder of a mortgage to provoke a judicial sale without first having the encumbered property appraised, and that, if such mortgage holder does foreclose without such appraisal, he is prohibited from thereafter proceeding against the mortgagor for any deficiency remaining on the debt.
It is to be noted that the statute does not suppress the waiver by the mortgagor of the benefit of appraisement of the mortgaged property in foreclosure proceedings. But the enactment restrains, as contrary to public policy, the practice of permitting the mortgagee to sell the encumbered property without having it appraised, if he desires to later maintain action against his debtor for a deficiency judgment. In other words, the mortgagee has the right to sell the property without appraisal but, if he elects to do so, he suffers the penalty of losing his right to obtain a deficiency judgment in the event the proceeds of the sale are insufficient to liquidate the debt.
... While the statute under consideration refers particularly to judicial sales without appraisement, we are of the opinion that the statement of the public policy therein is sufficiently broad to disclose that it was the intention of the lawmakers to place a stamp of disapproval on any practice whereby encumbered property is sold without judicial appraisement, and to sanction the type of agreement, such as the one before us, would be to allow the employment of a device calculated to defeat the underlying purposes which prompted the passage of the law.
Walmsley, 176 So. at 417.
In Southland Inv. Co. v. Lofton, 194 So. 125 (La.App. 2nd Cir.1940), the debtor purchased an automobile and financed it with a promissory note and chattel mortgage. The chattel mortgage provided the creditor, upon default by the debtor, could take possession of the chattel, sell the chattel at public or private sale, and deduct from the sale price all expenses for retaking, repairing and selling, including a reasonable attorney fee. In the case of a deficiency, the debtor would pay the same to the creditor with interest and the debtor confessed judgment for the deficiency. The debtor subsequently defaulted and gave a written voluntary surrender of the chattel to the debtor. The creditor sold the chattel at private sale, credited the debtor's account for the sale price and filed suit for the balance. Citing Walmsley, the court affirmed the trial court's dismissal of the creditor's claim pursuant to the LDJA and observed as follows in dictum:
We fully agree with this opinion and the finding therein is applicable to the case at bar. If there had been no collateral agreement, which clearly evidences the intent to defeat the underlying purposes which prompted the passage of the Act, and on June 6, 1938, defendant had decided it was to his advantage to turn over his car to his mortgagee for it to sell at private sale and apply the proceeds to the balance due, a different situation would confront us. Under this last stated condition, certainly Act No. 28 of 1934 could not apply, but that is not the situation in the case at bar.
Lofton, 194 So. at 127.
In Futch v. Gregory, 40 So.2d 830 (La. App. 2nd Cir.1949), the debtor borrowed $371 and gave the creditor a promissory note and a chattel mortgage on his used car. Four days later, the debtor surrendered the car to the creditor (when not in *896 default), apparently because the car did not give the service expected of it. The creditor repaired the car for $132.76, sold it for $250 and filed suit against the debtor for the balance of $253.76. The court cited Walmsley and Lofton in affirming the trial court's dismissal of the suit and observed as follows:
Section 2 of the 1934 act, in effect, declares that the act establishes a rule of public policy and that a mortgagor may not waive the benefits designed to be conferred upon him thereby; and, by the same token a mortgagee should not be permitted to profit from his own wilful efforts at circumvention thereof. Of course, this act was not designed to affect the freedom of a mortgagor and a mortgagee, with respect to the surrender of the mortgaged chattel to the latter in satisfaction, in whole or part, of the mortgage indebtedness, as they shall in good faith agree. In that case the title to the property would pass unconditionally to the mortgagee who would be free to sell the chattel for such price as he desired without the duty of accounting to the mortgagor therefor. But this is not the case before us.
* * * * * *
These two decisions hold that the 1934 act has application to a private sale of the mortgaged property by the mortgagee, which, of course, is always effected without the benefit of appraisement; and these holdings are based upon the public policy rule declared in the act. They fix a rule that when it appears that the surrender of possession of the mortgaged chattel, with authority given the mortgagee to sell same, as was done in the case at bar, such action, presumably is but a step in the effort to circumvent the law. This, of course, should and will be thwarted by the courts. If this should not be done the beneficent provisions of the 1934 act would virtually be rendered ineffective and the law would be as it was prior to the passage of the 1934 act. The cited decisions announce a sane and reasonable construction of the pertinent law, and no good reason has been assigned why they should not be followed in the instant case, and they will be.
[Emphasis added.]
Futch, 40 So.2d at 831 and 832.

Court of Appeal, First Circuit Jurisprudence on LDJA
In Farmer v. Smith, 57 So.2d 778 (La. App. 1st Cir.1952), the creditor sold a car to the debtor. The transaction was financed with an installment note secured by a chattel mortgage on the car. The debtor subsequently defaulted after making about half of the payments. The debtor surrendered the car to the creditor "for the benefit of all concerned, after having used, misused and rendered the same practically worthless as an automobile, the same to be repaired, sold and placed in proper running condition." The balance due on the note was $494.37. The car was repaired for $245.24 and sold for $475. The deficiency balance was $267.51. Without citing Walmsley, Lofton, or Futch, this court relied on the LDJA to affirm the dismissal of the creditor's petition with the following rationale:
As stated at the outset, the petition is vague but it seems to clearly show that the automobile of the defendant C.A. Smith was repossessed by the plaintiff, repaired and sold without appraisement. Under the terms of the aforesaid act, in view of his private sale without appraisement, it is our opinion that the debt was completely discharged and that no deficiency could thereafter be claimed by the plaintiff.
Farmer, 57 So.2d at 779.
In Soileau v. Pitre, 79 So.2d 628, 629 (La.App. 1st Cir.1955), the facts are set forth as follows:
The facts, which are not in dispute, show that petitioner had sold defendant an automobile for the sum of about $1,200, in return for which defendant gave petitioner a promissory note secured by chattel mortgage. After making several payments on the note, the *897 defendant was unable to continue making his regular payments and he gave petitioner a new open note in the sum of $300 and surrendered the car to petitioner. The petitioner sold the car, at private sale without appraisement, and now sues the defendant on the $300 note.
This court quoted extensively from Walmsley and Futch and held as follows:
The case now before us merely presents another scheme to circumvent the provisions of LSA-R.S. 13:4106 and 13:4107. The petitioner contends that such a holding in this case would deprive the parties of their freedom to contract. Article 11 of the LSA-Civil Code prohibits individuals from entering into contracts which are against public good. The Legislature and judicial decisions of our state have declared similar actions to be against the public policy of our state. To enforce the contract entered into by the parties to this suit would, in effect, give the Court's approval to a contract entered into to circumvent the Legislative will and the public policy of this state.
Soileau, 79 So.2d at 631.
In Hammond Finance Co. v. Carter, 83 So.2d 682 (La.App. 1st Cir.1955), the creditor financed the purchase of two trucks and a trailer with a promissory note secured by a chattel mortgage and another's personal endorsement. Subsequently, one of the trucks was sold to a third person, and the proceeds of the sale were credited against the debt. The maker and endorser (debtors) thereafter defaulted, and the creditor filed suit for the balance due. The debtors defended, in part, by contending a violation of the LDJA. This court affirmed a trial court ruling that there was no LDJA violation with the following:
Perhaps a different situation would be presented to us if rather than a sale of one of three mortgaged items from defendant McDonald to Ramsey, with defendant simply agreeing to release its mortgage against the property affected and making a collateral agreement with Ramsey to finance his purchase of the truck, a situation was indicated where the mortgagee finance company had actively participated in the sale by suggesting it, securing a purchaser, securing agreements as to the price, etc.,  in short, indicated a scheme to circumvent the provisions of the Deficiency Judgment Act, by forcing the mortgagor to sell the property to a third party. Or perhaps a different legal intention or effect would result if the single item subject to a mortgage were sold to a third party and the proceeds credited to a mortgage, which was extinguished by release of that property.
But in view of the findings which we accept that the sole function of the mortgagee herein insofar as the mortgagor was concerned was to release one of the three mortgaged articles from the chattel mortgage, in return for receipt of all or a portion of a purchase price agreed on independently by a mortgagor and a third party, we do not feel that the present instance is a situation affected by the public policy expressed in the Deficiency Judgment Act.
Hammond Finance Co., 83 So.2d at 684-685.
This holding was followed in Liberty Loan Corporation of Lafayette, Inc. v. Jobe, 203 So.2d 723 (La.App. 3rd Cir.1967).
In David Investment Company v. Wright, 89 So.2d 442 (La.App. 1st Cir. 1956), the debtor borrowed money and gave a promissory note secured by a chattel mortgage on seven cows. The debtor defaulted, and the creditor instituted executory process. The defendant bonded the cattle and vainly sought to enjoin the proceedings. Thereafter, the creditor and debtor entered into a written agreement which provided, in pertinent part, as follows:
That the defendant wanting to dispose of the cattle held under seizure to avoid further cost, and in view of the declining cattle market, it is mutually agreed and stipulated by and between David Investment Company, Inc., through undersigned counsel, and the defendant, Mrs. *898 Beatrice Wright, through her undersigned counsel, that the defendant be and she is hereby authorized to sell the cows which are under seizure herein and deposit the proceeds thereof in the registry of the Court to await the final outcome of this suit; the intent of this agreement being to authorize the Court to hold under seizure the proceeds of the sale of said cows in lieu of the cows themselves.
David Investment Company, 89 So.2d at 443.
The debtor then had some of the cows sold at a public (nonjudicial) sale. This court held the trial court correctly dismissed the creditor's suit with the following rationale:
However, mortgagee, holding the legal rights set forth, consented at mortgagor's insistence to release the cattle seized to the mortgagor in order "to avoid further costs and to secure a better price in the decreasing cattle market."
Without doubting appellant's argument that in this present instance it was to the benefit of the mortgagor for her to sell the cattle at the public cattle auction barn, in view of the declining market and to save the additional court costs and expense of advertising for a judicial sale, nevertheless under the stringent public policy provisions of the Deficiency Judgment Act as interpreted, a mortgage creditor is absolutely barred from a deficiency judgment where he provokes a sale, judicial or private, without the benefit of appraisement, LSA-R.S. 13:4106, see cases cited Soileau v. Pitre, La.App. 1 Cir., 79 So.2d 628. As we stated therein, 79 So.2d 631: "To enforce the contract entered into by the parties to this suit would, in effect, give the Court's approval to a contract entered into to circumvent the Legislative will and the public policy of this state."
[Emphasis added.]
David Investment Company, 89 So.2d at 444.
This case was distinguished from Hammond Finance Co. as follows:

Here the mortgagee's conduct not only promoted or induced the sale, it actually "provoked" it by the judicial seizure, so as to bring the sale squarely under the provisions of the Deficiency Judgment Act. The mortgagee was required to have had an appraisal in advance of the sale, with the sale at a price within the limits set by law with relation to said judicial appraisal, in order to preserve its rights to a deficiency judgment under the circumstances of this case.
[Emphasis added.]
David Investment Company, 89 So.2d at 444.
See also Wall v. McKean, 205 So.2d 482 (La.App. 1st Cir.1967).

Jurisprudence in Other Circuits on LDJA Since David Investment Company

In Shreveport Auto Finance Corporation v. Harrington, 113 So.2d 476, 477 (La.App. 2nd Cir.1959), the facts are set out as follows:
The stipulation recites that defendant bought an automobile from the Saxon Auto Sales, making a small down payment and giving a note for the balance; that he found himself unable to meet his obligation on the note and advised the Saxon Auto Sales that he wished to surrender the car and be relieved of the balance due; that "Saxon Auto Sales agreed to allow him to do this, explaining that market value of the car had dropped, and it would be necessary to give a note for $300, to reimburse them for the loss. Defendant gave the note and signed title to the car." Upon defendant's failure to make payment of the $300 note, this suit was instituted by plaintiff, Shreveport Auto Finance Corporation, which was named as payee in the note.
The court cited David Investment Company and Soileau for the proposition that a creditor who provokes a private sale without the benefit of appraisement is not entitled to a deficiency judgment and reversed *899 the trial court judgment in favor of the creditor.
In Justice v. Caballero, 393 So.2d 866 (La.App. 4th Cir.1981), the debtors and a third person purchased a food store from the creditor in 1964 giving a note secured by a chattel mortgage on the inventory, stock, equipment and fixtures of the business. In 1972, the third person transferred his interest in the store to the debtors, the original note was cancelled and the debtors signed a new note for the balance due. The only security on the new note apparently was the original vendor's lien. In 1973, the debtors closed the store and gave the creditor written authority to act as their agent to sell the merchandise and equipment of the store and use the proceeds of the sale to pay taxes and the balance due on the new note. This was done, and the creditor brought suit on the new balance due. The court framed the issue to be decided as follows:
We are confronted then with the question whether the Deficiency Judgment Act applies to the balance owed on a promissory note (not secured by a chattel mortgage but on which there was a vendor's privilege) where property owned by the debtor is sold by the creditor (as the authorized agent of the debtor) and brings an amount from the sale that is insufficient to satisfy the balance owed on the note. We hold that the Deficiency Judgment Act does apply to the promissory note in our case and, accordingly, reverse.
Justice, 393 So.2d at 867-868.
The court cited David Investment Company and Lofton and observed as follows:
Although the record in our case does not indicate that the agency agreement was anything other than an arm's length transaction, it is nonetheless in contravention of the strict public policy underlying the Deficiency Judgment Act.
Justice, 393 So.2d at 869.
The case of American Security Bank of Ville Platte v. Dufour, 465 So.2d 162 (La. App. 3rd Cir.1985) is very similar to the instant case. In the late 1970's, Dufour was an active and successful contractor who financed his business through the creditor with handnotes secured by collateral mortgages. In 1981, all of the handnotes were consolidated into one handnote which was secured by collateral mortgages on three pieces of real estate and a certificate of deposit. What transpired next is set forth in the opinion as follows:
On March 5, 1982, the situation stood like this: Dufour still owed the bank most of the consolidation handnote, and the bank held as security for that note three collateral mortgage notes, including the mortgage on Lot 15 of the Kennedy Estates Property, plus a certificate of deposit. Because of Dufour's declining financial situation, he and the bank on March 5, 1982, executed two written agreements. By means of the first document (called an act of exchange but actually a giving in payment), the Dufours conveyed one piece of property (not the subject of any of the collateral mortgages pledged to secure the consolidation note), for a credit of $34,000.00, a part of which was credited against the February 20, 1981, promissory note. After this credit, and taking into account earlier payments on the note, the amount of the balance stood at $70,537.35. By another instrument dated that same day, March 5, 1982, likewise called an act of exchange but likewise being obviously a giving in payment, the Dufours transferred to the bank other property, which the parties agreed was worth $50,000.00, and which was apparently the subject of a collateral mortgage dated March 8, 1979, securing a collateral note in the amount of $60,000.00. This instrument contains the following language:
"As a further condition of this exchange, while reserving unto itself all courses [sic] of action against other mortgaged property, AMERICAN SECURITY BANK OF VILLE PLATTE covenants that it will not proceed against the homeplace of RAYMOND J. DUFOUR and LILLIAN DUFOUR, and AMERICAN SECURITY BANK *900 OF VILLE PLATTE further covenants that it will not execute any judgment it may obtain against either the homeplace of the above named, or against them personally, and that once the mortgaged property against which judgment is obtained is sold, any judgments involving RAYMOND J. DUFOUR and LILLIAN DUFOUR, which are unsatisfied, will be cancelled."
When the credit given by means of this agreement was applied to the consolidation note, it left a balance of $20,537.35.
Dufour, 465 So.2d at 164.
The court cited extensively from David Investment Company and affirmed the trial court's dismissal of the creditor's claim with the following rationale:
In the present case on March 5, 1982, the Dufours executed a giving in payment which transferred to the bank title to one of the mortgaged properties. There was no appraisement of the property. It is clear from the act that the Dufours agreed to relinquish this property to insure that the bank would not obtain a deficiency judgment and proceed to execute judgment against their homeplace. It is also clear that the bank actively participated in the agreement as to price and other terms, thereby participating in a scheme to circumvent the provisions of the Act. See Hammond, supra. The agreement enabled the bank to secure the property without public sale with benefit of appraisement.
Under these facts and the jurisprudence we find that the stringent public policy provisions of La.R.S. 13:4106 are applicable to this situation and that the mortgagee bank is prohibited from obtaining a deficiency judgment against the defendants.
Dufour, 465 So.2d at 166.

Louisiana Supreme Court Jurisprudence
In Southland Inv. Co. v. Motor Sales Co., 198 La. 1028, 5 So.2d 324 (1941), the debtors were a husband and wife who operated a commercial partnership that bought and sold new and used cars. When the debtors made credit sales, they took from the purchasers promissory notes secured by chattel mortgages on the cars, endorsed the notes and sold them to the creditor. Ultimately, the creditor was the holder of fifty-eight notes upon which the purchasers defaulted. The creditor "repossessed" thirty-four of the cars, sold them at private sale and applied the proceeds of the sales to the respective notes. The debtors contended they were not liable on this portion of the creditor's claim because of the LDJA. In affirming the trial court judgment in favor of the creditor, the court observed as follows:
Unquestionably this act was enacted for the benefit and protection of the mortgage debtor and, ordinarily, under the express provisions of Act No. 64 of 1904 (known as the Negotiable Instruments Act) "A person secondarily liable on the instrument is discharged * * * By any act which discharges the instrument * * *." Section 120. According to the record as made up in this case, however, the cars listed and described in Exhibit A were repossessed and sold by the plaintiff at private sale for the best price obtainable with the consent and acquiescence of the defendants, for the best interest of all parties concerned. Under these circumstances we are of the opinion that the defendant is liable to the plaintiff for any amount remaining unpaid on the notes defendant transferred to it under the transactions listed in Exhibit A, which, as shown by the record, is $3,617.50.
[Emphasis added.]
Motor Sales Co., 5 So.2d at 326.[3]
In Howard Trucking Company, Inc. v. Stassi, 485 So.2d 915 (La.1986), the creditor transferred possession of vehicles and oil field trucking equipment to the debtor in a written agreement styled a lease. The agreement provided for a $275,000 down *901 payment, forty-six monthly payments of $3,489.42 and a $100 option to purchase at the end of the lease term. The debtor defaulted in making monthly payments and filed a Chapter 11 petition in bankruptcy. On the creditor's motion, the contracts between the creditor and debtor were rejected by the bankruptcy judge, and the creditor regained possession of the vehicles and equipment. The creditor advertised a sale of the property nationally and subsequently sold it at a nonjudicial sale without appraisal for a net of $491,841.12. The creditor then filed suit against the debtor's guarantors for $950,000 in past due "rent." The Court found the agreement between the parties was a sale (not a lease) and denied recovery to the creditor for failure to comply with the LDJA. The Court observed as follows:
Howard Trucking's final contention is that its efforts to advertise nationally and obtain the best possible price for the equipment absolves it from failure to comply with the Deficiency Judgment Act. Section 4106 embodies a firm public policy of this state and requires strict adherence. Appraisal cannot be waived, even by consent of the debtor. We decline to override the long and consistent line of jurisprudence finding appraisal an absolute prerequisite to a deficiency judgment.
[Footnote omitted.]
Stassi, 485 So.2d at 919.
The Court did not cite, discuss or overrule Motor Sales Co., nor did it cite or discuss any cases from the Courts of Appeal.

Jurisprudence on Liability of Sureties Under the LDJA
In Simmons v. Clark, 64 So.2d 520 (La. App. 1st Cir.1953), the debtors executed a note for $1,836.58 secured by a mortgage in favor of the creditor. As additional collateral, the defendant executed a mortgage on other property for $1,800, signed a note for that amount and pledged the note to the creditor. The debtors defaulted, the creditor foreclosed via executory process and sold the debtor's property at judicial sale without appraisal for $221.57. The creditor then filed against the defendants for the balance due of $1,439.07. The defendants filed a peremptory exception pleading the objection of no cause of action asserting that, because the creditor could not get a deficiency judgment against the debtors, the creditor did not have a cause of action against the defendants who merely gave a collateral mortgage as security on the primary obligation. The trial court sustained the exception. This court affirmed with the following rationale:
Petitioner claims that, in the instant case, there is no violation of public policy as is stated in LSA-R.S. 13:4107. He bases his contention on the fact that petitioner is proceeding against the surety, not the debtor. He admits that he has no right of action against Holmes. We, however, are unable to agree with the contention that he is not attempting to violate public policy. The law clearly states that it is against public policy to attempt to secure a deficiency judgment when the judicial sale, made without the benefit of appraisement, failed to bring in sufficient proceeds to discharge the indebtedness. Under the laws of suretyship, the surety here may interpose the same defense which is available to the principal debtor, as there are no personal defenses present. Furthermore, by the provisions of Article 3061 of the LSA-Civil Code, the surety is discharged from his obligation when, by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety.
Through the act of the creditor the property of the mortgagor, Holmes, was sold. The creditor now proceeds against the sureties for a deficiency judgment. No notice was given the surety of the original foreclosure proceeding against Holmes, nor were they requested to pay the indebtedness. There are no rights of the principal to which the sureties may be subrogated. Clearly, under the provisions of Article 3061, the petitioner has lost his rights against defendants.

*902 We fail to find any error in the holding of the lower court. By the act of petitioner in foreclosing against Holmes without benefit of appraisement, he lost his right to a deficiency judgment. Under the laws of suretyship, this defense of the principal obligor now operates in favor of the sureties. Furthermore, under the provisions of Article 3061 of the LSA-Civil Code, the petitioner has no right or mortgage which might be subrogated in favor of defendants should the demand of petitioner be allowed.
Simmons, 64 So.2d at 523.
In The Farmerville Bank v. Scheen, 76 So.2d 581 (La.App. 2nd Cir.1954), the creditor held a promissory note secured by a chattel mortgage on an automobile which was given by Scheen (debtor) and endorsed by Mingledorff (surety). The debtor defaulted. The debtor and surety then requested the creditor to repossess the car and sell it at private auction. This request was in writing and was prepared by an attorney. The creditor did as requested and then filed suit against the debtor and surety for a deficiency judgment. The debtor defended the suit on the LDJA, and the surety defended on La.C.C. art. 3061 and Simmons v. Clark. The trial court rejected the creditor's claims. The Second Circuit affirmed the judgment in favor of the debtor citing Walmsley, Lofton, Futch and Farmer. However, the court reversed the judgment in favor of the surety by agreeing with, but distinguishing, Simmons v. Clark and relying heavily on Motor Sales Co. The court used the following rationale:
As stated by the Supreme Court, the deficiency judgment statute was enacted for the benefit and protection of the mortgage debtor and nowhere does the statute refer to or mention public policy towards or relief for parties secondarily or otherwise obligated for the indebtedness, such as an endorser. Therefore, provisions of the statute pronouncing the principle of public policy is inapplicable under the facts and circumstances of this case to an endorser, whose rights and remedies are prescribed and governed by other applicable laws, particularly the articles of the Code pertaining to suretyship, the provisions of which were applied in the Simmons v. Clark case.
The endorser Mingledorff under the facts and circumstances of this case, as detailed hereinabove, is in no position to avail himself of such provisions and particularly the provisions of Art. LSA-C.C. 3061, but is precluded therefrom by his own actions, as was substantially held in Southland Inv. Co., Inc., v. Motor Sales Co., supra. Mingledorff actively promoted and negotiated the private sale of the automobile, as testified to by him, for the use and benefit of all parties concerned. He not only consented to and acquiesced in the sale but it was through his suggestion and promotion it was carried out. The record, however, reflects the utmost good faith of both plaintiff and the defendant endorser.

[Emphasis added.]
Scheen, 76 So.2d at 586.
In Commercial Credit Equipment Corporation v. Larry Parrott of Gueydan, Inc., 212 So.2d 860 (La.App. 3rd Cir.1968), writ refused, 252 La. 895, 214 So.2d 719 (1968), the surety sold farm equipment to the debtor and financed the balance due on the sale by a note secured by a chattel mortgage. The surety had a previously executed agreement with the creditor wherein the creditor would buy notes from the surety and the surety agreed to repurchase the equipment if the debtor defaulted and the creditor repossessed. The debtor defaulted, and the creditor made demand unsuccessfully on the surety to repurchase. The creditor secured three bids on the property and sold the property by private act to the highest bidder. The creditor then filed suit against the surety for the balance due. The trial court rendered judgment in favor of the creditor. The Third Circuit affirmed with the following rationale on original hearing:
The second and main contention advanced by counsel for defendant is that the judgment should be reversed, as the transaction in litigation violates LSA-R.S. *903 13:4106 et seq., commonly referred to as the Deficiency Judgment Act. This statute provides that a deficiency judgment is prohibited if the sale is made without benefit of appraisal. Also, that the provisions of the Act cannot be waived as a matter of public policy.
This argument is without merit. Under the provisions of section 6 of the Limited Liability Plan Agreement, defendant agreed that plaintiff could sell the repossessed property at private sale without notice to it. Plaintiff went out of its way to satisfy defendant. They notified it on three occasions and gave it the opportunity to repurchase the equipment or pay the balance due thereon.
Larry Parrott of Gueydan, Inc., 212 So.2d at 864.
The Third Circuit then granted a rehearing en banc but reinstated its prior opinion with the following:
Rehearing was granted in the instant case for the reason that some members of this Court were of the opinion that the Limited Liability Plan Agreement as set forth in the original opinion herein violated LSA-R.S. 13:4106 et seq., commonly referred to as the Deficiency Judgment Act, for the reason that the property repossessed by plaintiff was sold at private sale without benefit of appraisement.
After due consideration of the matter we hereby reinstate our original decree.
In the case of Southland Investment Co. v. Motor Sales Co., 198 La. 1028, 5 So.2d 324, the Supreme Court of this State held that the deficiency judgment statute was enacted for the benefit and protection of the mortgage debtor and nowhere does the statute refer to or mention public policy towards or relief for parties secondarily or otherwise obligated for the indebtedness, such as an endorser. The Court also held that the provisions of the statute pronouncing the principle of the public policy were inapplicable to the case of an endorser whose rights and remedies are prescribed and governed by other applicable laws, particularly the articles of the Code pertaining to suretyship.
Larry Parrott of Gueydan, Inc., 212 So.2d at 864.
The surety then applied to the Louisiana Supreme Court for a supervisory writ which was refused with the following language:
Writ refused. There appears no error of law in the Court of Appeal's judgment.
Larry Parrot of Gueydan, Inc., 214 So.2d at 719.
In General Motors Acceptance Corporation v. Smith, 399 So.2d 1285 (La.App. 4th Cir.1981), the court reversed a trial court judgment in favor of a creditor against a surety. This opinion does not have a statement of facts. However, the opinion discusses the application of the public policy of the LDJA to sureties as follows:
That public policy ordinarily discharges persons secondarily liable because the discharge of the person primarily liable releases one in the position of a surety, Simmons v. Clark, La.App. 1 Cir.1953, 64 So.2d 520, or an indorser, Southland Inv. Co. v. Motor Sales Co., 1941, 198 La. 1028, 5 So.2d 324, unless the secondary obligor consented to the sale without appraisement, Southland above; Farmerville Bank v. Scheen, La.App. 2 Cir.1954, 76 So.2d 581; Commercial Cr. Eq. Corp. v. Larry Parrott of Gueydan, La.App. 3 Cir.1968, 212 So.2d 860, writ refused 214 So.2d 719 (see also Exchange Nat. Bank v. Spalitta, La.App. 4 Cir.1974, 295 So.2d 18, rev'd on other grounds, La.1975, 321 So.2d 338).
[Footnote omitted.]
[Bolding added.]
Smith, 399 So.2d at 1287.
The court stated the creditor's argument was that the surety's contract provided that his liability was not affected by the discharge of the debtor and, therefore, the rule of La.C.C. 2205 that the discharge of the debtor discharged the surety was not applicable. The court framed the question *904 on appeal as whether such a surety contract provision would allow a creditor to successfully collect from a surety in situations where he could not obtain a deficiency judgment against a debtor because of the LDJA. The court found such a contractual provision unenforceable with the following rationale:
The consequence would thus be that the principal debtor would be liable to the surety if the creditor obtains a judgment against the surety.
That consequence is inconsistent with R.S. 13:4106 and -7. The debtor cannot himself waive the public policy of § 4106, and a surety cannot be allowed to waive it for the debtor, and the creditor cannot be allowed to defeat that public policy by the simple device of obliging the debtor to provide a surety who can then collect from the debtor. The provision of the surety's contract making his liability unaffected by the discharge of the debtor is inconsistent with the unwaivable public policy of R.S. 13:4106 and is therefore unenforceable.
Smith, 399 So.2d at 1288.
In Domingues Motors, Inc. v. Lalonde, 417 So.2d 900 (La.App. 3rd Cir.1982), the surety's (Lalonde) daughter (debtor) bought an automobile from the creditor. The balance on the purchase price was financed by a note secured by a chattel mortgage on the car. The surety gave a continuing guarantee agreement to the creditor which provided, among other things, that his liability would not be affected by discharge or release of the debtor and that he (the surety) waived notice of nonpayment, prosecution of collection, foreclosure and possessory remedies. The note, chattel mortgage and continuing guaranty were assigned to a third party. The debtor subsequently took voluntary bankruptcy. The trustee in bankruptcy transferred the car to the third party in full satisfaction of the claim. The third party negotiated the note, mortgage, surety agreement and car back to the creditor. The creditor sold the car at private sale and sued the surety for the balance due. The trial court granted summary judgment in favor of the surety. On appeal, the creditor sought reversal of the trial court judgment contending (1) the debtor's discharge in bankruptcy did not affect the validity of the guaranty agreement; and (2) summary judgment should be granted only if there is no genuine issue of material fact. The Third Circuit quoted extensively from Smith, including the portion which cited Simmons v. Clark, Motor Sales Co., Scheen and Larry Parrott of Gueydan, Inc., and found "the principles of law announced therein to be dispositive of the issue presented in the instant case." Lalonde, 417 So.2d at 903-904. See also Guaranty Bank of Mamou v. Community Rice Mill, Inc., 490 So.2d 736 (La.App. 3rd Cir.1986), writ granted, 494 So.2d 1164 (La. 1986). Lalonde does not overrule Larry Parrott of Gueydan, Inc. The facts of Lalonde do not show that the surety consented to the sale without appraisal.

Recent Legislation
In the last session of the legislature, Act 489 of 1986 was passed which, among other things,[4] enacted La.R.S. 13:4108.1 (in the LDJA) which provides as follows:
*905 § 4108.1. Deficiency judgment when obligations based upon commercial transaction
A. Notwithstanding any other law to the contrary, including but not limited to R.S. 13:4106 and 4107, if a mortgagee or other creditor holds a mortgage, pledge, or privilege which secures an obligation in a commercial transaction, the mortgagee or other creditor may collect from or pursue any debtor, guarantor, or surety for a deficiency judgment on the secured obligation whether or not the mortgagee or other creditor has foreclosed on all or any of the property and sold such property at a judicial or private sale, with or without appraisal, regardless of the minimum bid, and whether or not the mortgagee or other creditor has acquired such property from any debtor, guarantor, or surety pursuant to a complete or partial dation en paiement. In no event, however, may a mortgagee or other creditor pursue any debtor, guarantor, or surety for more than the secured obligation, minus the reasonably equivalent value of the property sold.
B. For the purpose of this Section, the terms "commercial transaction" and "reasonably equivalent value" shall have the following meanings:
(1) "Commercial transaction" means any transaction entered into primarily for business or commercial purposes.
(2) "Reasonably equivalent value" means the value that the owner and the mortgagee or other creditor of the property being sold or otherwise disposed of agree to attribute to the property for the purposes of reducing the secured debt.
This law does not state it is to have retrospective operation. La.R.S. 1:2; La.C.C. art. 8. In Graham v. Sequoya Corporation, 478 So.2d 1223, 1225-1226 (La.1985), appears the following:
C.C. 8 states the general rule that a law "can prescribe only for the future, it can have no retrospective operation ..." Additionally, R.S. 1:2 mandates that no statute is retroactive unless expressly stated. From these principles it has developed and is consistently stated that the rule of prospective application applies to laws that are substantive in nature, but laws that are procedural, remedial or curative may be accorded retroactive effect.... However, a law will not be applied retroactively if its language evidences a contrary intent or the retroactivity would operate to disturb vested rights.
Further, in Weber v. Charity Hospital of Louisiana at New Orleans, 475 So.2d 1047, 1052 (La.1985), where the express reservation of rights against unreleased obligors provision of La.C.C. art. 2203 was repealed prospectively by the legislature (and, thus, facially not applicable to the facts of the case), the Court observed as follows:
Further, the Legislature has now eliminated the requirement of an express reservation, *906 apparently recognizing that the "trap" created by the technical rule of former Article 2203 served no useful purpose and simply created an artificial presumption of the obligee's intent contrary to the usual rules of law and common sense.... Because of this change, there is little value in perpetuating the inequities which had prevailed under more rigid interpretations of the discarded law. Accordingly, we conclude that Charity and IBB were not discharged from their obligations to Gaynell Weber because of her compromise with the host driver's insurer.
Although Act 489 of 1986 did not become effective until August 30, 1986 (La. Const. of 1974, art. III, § 19), Fidelity contends in brief it is retrospective and applicable to the instant case because it is interpretive, corrective and an expression of public policy. Because we are able to decide this case on other grounds, we do not reach a decision on this issue.[5]

Applicability of the LDJA to a Partial Dation Without Appraisal
The initial jurisprudence under the LDJA indicated that the protection of the LDJA was extended from judicial sales to private sales so that overbearing creditors could not do indirectly that which was prohibited directly by the LDJA. Such an interpretation of the law was required to impliment the strong public policy expressed in the LDJA that debtors (who are in inferior bargaining positions and have limited or no means to resist) should be protected by the law in certain situations from predatory creditors. As indicated in Futch, the LDJA "was not designed to affect the freedom of a mortgagor and a mortgagee, with respect to the surrender of the mortgaged chattel to the latter in satisfaction, in whole or in part, of the mortgage indebtedness, as they shall in good faith agree"; rather the rule was that "when it appears that the surrender of possession of the mortgaged chattel, with authority given the mortgagee to sell same,... such, action, presumably is but a step in the effort to circumvent the law." [Emphasis added.] As indicated in Motor Sales Co., where the creditor repossessed and sold the mortgaged property "at private sale for the best price obtainable with the consent and acquiescence of the defendants, for the best interest of all parties concerned", the LDJA did not bar a deficiency judgment.
It appears that a majority of the jurisprudence holds that a creditor is absolutely barred from obtaining a deficiency judgment against a debtor if there is a private sale of the mortgaged property without appraisal.[6] As indicated in David Investment Company, this absolute bar applies even when the debtor actively seeks the sale, the sale benefits the debtor, and the debtor does the selling himself, if the creditor in any way participates in the transaction.
*907 We agree that the public policy for the LDJA mandates that debtors must be protected from overbearing creditors and that such creditors should not be allowed to circumvent the provisions of the LDJA. However, we question whether it was the intent of the LDJA to penalize a lenient creditor for entering into an agreement that benefits the debtor. An absolute rule prohibiting all agreements proscribes such an agreement. Obviously, if creditors are penalized (denied a deficiency judgment) for making agreements favorable to debtors, they will probably cease to do so. Thus, ultimately, the debtor will be prohibited (as a practical matter) from negotiating a more favorable solution to his debt problem than judicial foreclosure with subsequent deficiency judgment (with all of the attendant court costs, attorney fees and sheriff's commissions). We do not believe such a result was intended by the LDJA. We believe a rule of law which requires such a result is unduly harsh and unfair to creditors and debtors. Accordingly, we decline to apply the absolute bar rule of David Investment Company to a partial dation, as did our brothers in the Third Circuit in Dufour. This holding is reinforced by the expression of public policy in Act 489.
We agree with the following observations found in T. Harrell, Developments in the Law, 1981-1982, Security Devices, 43 La.L.Rev. 569, 571-572 (1982):
If the creditor agrees to take property of the debtor under circumstances which the law treats as being equivalent to a dation en paiement  a payment or full performance of the obligation  as is the case with the Deficiency Judgment Act, there should be no recovery from the surety. There is no "deficiency" to be paid by the surety because, by accepting a waiver of the benefit of appraisal, the creditor (as the court noted) is in effect agreeing to accept the property or its proceeds in full satisfaction of the debt. The debtor is not "released" or "discharged" as is contemplated by the General Motors Acceptance [Smith] type agreement of suretyship if the debt is so satisfied. On the other hand, if when the debt becomes due the surety should agree, in consideration of the acceptance by the creditor of some of the property of the debtor, that he will pay some additional amount to satisfy the debt the surety should be permitted to do so. Such an agreement does not violate either the spirit or the purpose of the Deficiency Judgment Act. If the surety pays the creditor in full (as the creditor may insist he do), he will be subrogated to the debt and have the same options as the creditor had with respect to the debtor. The surety then may pursue the debtor by ordinary process or execute without benefit of appraisal upon such property as he can reach and charge off the balance as a loss.
[Bolding added.]
Although we decline to apply the absolute bar rule to partial dations, we believe any applicable rule should protect debtors (and sureties) from overbearing creditors and preclude circumvention of the public policy of the LDJA. Accordingly, for cases arising prior to the effective date of Act 489 (August 30, 1986), we hold that, whenever a creditor and debtor (and/or surety) enter into a partial dation of the encumbered (mortgaged or otherwise) property of the debtor without benefit of appraisal, a presumption arises that the agreement does not benefit (is unfavorable to) the debtor (and/or surety) and constitutes an attempt to unlawfully circumvent the LDJA, thus precluding a deficiency judgment in favor of the creditor. However, this presumption is rebuttable, and the creditor bears the burden of showing he acted in good faith, the agreement was consented to by the debtor (and/or the surety) and the agreement benefited (was favorable to) the debtor (and/or the surety). If the creditor can make such a showing, the partial dation is not in violation of the LDJA and the creditor is entitled to a deficiency judgment, if all other requirements of law have been met.

*908 SUMMARY JUDGMENT
This action was tried on cross motions for summary judgment. In Topole v. Eidson, 464 So.2d 406, 409 (La.App. 1st Cir. 1985), appears the following:
The law applicable to summary judgments is set forth in Massingale v. Sibley, 449 So.2d 98, 100 (La.App. 1st Cir. 1984), as follows:
The law is well settled that a motion for summary judgment should be granted if, and only if, the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966; Stallings v. W.H. Kennedy & Son, Inc., 332 So.2d 787 (La. 1976). Only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law on the facts before the court is a summary judgment warranted. Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976). The burden of showing that there is not a genuine issue of material fact in dispute is upon the mover for summary judgment. Any doubt is resolved against the granting of a summary judgment and in favor of a trial on the merits to resolve disputed facts. Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963).
See also Quintana Petroleum Corporation v. Alpha Investments Corporation, 435 So.2d 1092 (La.App. 1st Cir.1983). If the supporting documents presented by a party moving for a summary judgment are sufficient to resolve all genuine issues of fact, the burden shifts to the opposing party to present evidence showing that material facts are still at issue. At this point, the opposing party may no longer rest on the allegations and denials contained in his pleadings. La.C.C.P. art. 967; Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772 (La.1980); Broussard v. Henry, 423 So.2d 67 (La.App. 1st Cir.1982).
There is no dispute as to the nature of the transactions between the parties. University borrowed money from Fidelity; the loan was evidenced by a promissory note secured by mortgages on two pieces of property; Frey was a guarantor (surety) on the loan; University transferred title to the mortgaged property to Fidelity (via a partial dation) for a $140,000 credit on the debt and gave a new note, guaranteed by Frey, for the balance due on the loan; Fidelity subsequently sold the mortgaged property at a private sale without appraisal for $140,000; and University and Frey declined to pay on the new note. These facts create a presumption that the transactions were not beneficial to the debtor and surety and were intended to circumvent the LDJA. The burden is on Fidelity to show that there is no material issue of fact that it acted in good faith, that University and Frey consented to the agreement and that the agreement was favorable to University and Frey.
After reviewing the documentary evidence and the depositions, we conclude that the basic facts are undisputed and show that Fidelity acted in good faith, University and Frey consented to the partial dation agreement and this agreement was beneficial to University and Frey (when considered in juxtaposition with the other available alternatives). Accordingly, we find that the partial dation agreement did not violate the public policy of the LDJA.[7] The judgment of the trial court is correct and is affirmed.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.
*909 SHORTESS, J., dissents with reasons.
EDWARDS, CRAIN and LOTTINGER, JJ., dissent for the reasons assigned by SHORTESS, J.
SHORTESS, Judge, dissenting.
The facts of this case do not warrant the majority's intrusion upon the salutary public policy, long in effect, which protects debtors in deficiency judgment situations.
The majority's case-note approach to this problem does not distinguish the latest expression of our Supreme Court in Howard Trucking Co., Inc. v. Stassi, 485 So.2d 915 (La.1986), which I feel should be applicable here.
Also, the majority's opinion seems to vascillate as to whether La.Acts, No. 489, should apply here. Initially, the opinion states that it need not decide whether said act is retroactive. However, it later states that its holding is supported by the spirit of that act. I believe that Act 489 should not be given any retroactive effect (either corporeally or spiritually) because it affects substantive rights.
I respectfully dissent.
NOTES
[1] At all times pertinent herein, La.R.S. 13:4106 provided as follows:

If a mortgagee or other creditor takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency, except as provided in the next paragraph.
If a mortgage or pledge affects two or more properties, movable, immovable, or both, the judicial sale of any property so affected without appraisement shall not prevent the enforcement of the mortgage or pledge in rem against any other property affected thereby.
La.R.S. 13:4107 provided as follows:
R.S. 13:4106 declares a public policy and the provisions thereof can not, and shall not be waived by a debtor, but it shall only apply to mortgages, contracts, debts or other obligations made, or arising on or after August 1, 1934.
La.C.C.P. art. 2771 provides as follows:
The creditor may obtain a judgment against the debtor for any deficiency due on the debt after the distribution of the proceeds of the judicial sale only if the property has been sold under the executory proceeding after appraisal in accordance with the provisions of Article 2723.
La.C.C.P. art. 2772 provides as follows:
A creditor may obtain a deficiency judgment against the debtor either by converting the executory proceeding into an ordinary proceeding as provided in Article 2644, or by a separate suit. In either case, the defendant must be cited, and all of the delays and formalities required in ordinary proceedings must be observed.
[2] The LDJA is not applicable to leases. Executive Car Leasing Company of New Orleans, Inc. v. Alodex Corporation, 279 So.2d 169 (La.1973). The LDJA is not applicable to sales under Chapter X of the Bankruptcy Act. Exchange National Bank of Chicago v. Spalitta, 321 So.2d 338 (La.1975). The LDJA is not applicable to sales of pledged stock on a national stock exchange. International City Bank & Trust Company v. Zander, 378 So.2d 506 (La.App. 4th Cir.1979).
[3] The opinion in Motor Sales Co. was favorably reviewed in H. Daggett, The Work of the Louisiana Supreme Court for the 1941-1942 Term  Security Devices, 5 La.L.Rev. 207 (1943).
[4] Act 489 of 1986 also enacted La.R.S. 13:4108 in the LDJA, which provides as follows:

Notwithstanding any other law to the contrary, including but not limited to R.S. 13:4106 and 4107, none of the following actions by a mortgagee or other creditor shall prohibit the mortgagee or other creditor from obtaining a deficiency judgment against any debtor, guarantor, or surety, notwithstanding the fact that a sale of property or collateral may have occurred at a judicial sale without appraisal, at a private sale with or without appraisal, or at a judicial sale with a defective appraisal:
(1) A sale through the New York Stock Exchange, the American Stock Exchange, or the NASDAQ, of any pledged stock, bonds, or options registered or traded on such exchanges.
(2) A sale through the Chicago Commodity Exchange of any pledged options registered or traded on such exchange.
(3) A sale pursuant to an order of a United States Bankruptcy Court, or of a United States District Court sitting in bankruptcy.
(4) The mortgagee's or other creditor's exercise of its rights against property subject to a mortgage, pledge, privilege, or encumbrance in favor of such creditor, when the property or collateral is located outside the state of Louisiana, and the creditor has elected to proceed under the laws of the state, country, or territory where the property or collateral is then located to seize or sell such property or collateral.
(5) The collection or receipt of: any proceeds of any pledged negotiable or nonnegotiable note; any funds through the offset of any pledged deposit of cash, whether in the form of a demand deposit account with any institution insured by any agency of the federal government, certificate of deposit, or otherwise; any proceeds of any pledge or assignment of accounts receivable; or any proceeds of any pledge or assignment of the right to receive income under any lease or rent of movable property or immovable property.
(6) Collection or receipt of insurance proceeds under a simple or standard loss-payee clause.
(7) Collection or receipt of the return of any unearned premiums of any insurance policy.
Query: Is La.R.S. 13:4108(6) intended to legislatively overrule Rushing v. Dairyland Insurance Company, 456 So.2d 599 (La.1984) wherein it was held that the LDJA barred a creditor from collecting under a simple loss-payee clause of the collision coverage of an automobile policy of insurance where the creditor previously had the mortgaged automobile sold judicially without appraisal?
[5] A court may take judicial notice of the journals of the Houses of the State Legislature. Bethlehem Supply Co. v. Pan-Southern Petroleum Corporation, 207 La. 149, 20 So.2d 737 (1945). The legislative history of Act 489 of 1986 is intertwined with the decision in Howard Trucking Company, Inc. v. Stassi. The Stassi decision came down on March 31, 1986, and a rehearing was denied therein on May 9, 1986. Act 489 commenced its legislative voyage as House Bill (HB) 1104, which was introduced on May 2, 1986. As initially drafted, HB 1104 only applied to La.R.S. 13:4103 and executory process. On May 15, 1986, HB 1104 was passed unamended by the House of Representatives by a vote of 99-0. On June 3, 1986, HB 1104 was amended in a Senate Committee to add La.R.S. 13:4108 and 4108.1. On June 16, 1986, HB 1104, as amended, was passed by the Senate by a vote of 34-1. On June 19, 1986, the House of Representatives concurred in the Senate amendments by a vote of 97-0.
[6] In Stassi, the court stated an "appraisal was an absolute prerequisite to a deficiency judgment." It appears unclear what type of appraisal would be required to bring a private sale in compliance with the LDJA. If a judicial appraisal procedure is required, then the creditor would have to file suit against the debtor and prosecute the suit through the judicial appraisal before the private sale can be consummated. If a private appraisal procedure is utilized, must it be similar to a judicial appraisal procedure, or may it be valid in some other form?
[7] Because Frey (the surety) consented to the partial dation and actively participated in its confection, it would seem that he is liable under the existing jurisprudence for sureties, as expressed in Motor Sales Co., Scheen and Larry Parrott of Gueydan, Inc. This jurisprudence was cited in Smith and Lalonde, but the results of those cases were different because there was no showing of consent by the sureties therein.