673 So.2d 658 (1996)
FRANKLIN & MOORE
v.
GILSBAR, INC.
No. 95 CA 1520.
Court of Appeal of Louisiana, First Circuit.
May 10, 1996.
*659 Charles A. O'Brien, Baton Rouge, for Plaintiff-Appellee Franklin & Moore.
Fritz B. Ziegler, Monroe & Lemann, Covington, for Defendant-Appellant Gilsbar, Inc.
Before SHORTESS, PARRO and KUHN, JJ.
PARRO, Judge.
This case involves a miscalculation of the premium for the purchase of an optional extended reporting period endorsement on a legal malpractice insurance policy. The trial court ordered a portion of the premium returned to the law firm and denied the insurance broker's motion for a new trial. This appeal followed. We affirm.

FACTS AND PROCEDURAL HISTORY
On October 1, 1986, the law firm of Franklin & Moore ("F & M") became an insured under a legal malpractice insurance policy underwritten by The Home Insurance Company and written through Gilsbar, Inc. ("Gilsbar"). The policy included an option to purchase an extended reporting period endorsement ("ERP"also commonly referred to as a "tail") at the end of the policy term, which would allow an insured firm to report claims made after the termination of its claims-made policy. The premium for a 36-month ERP was described in the policy as 185% of the last annual premium. On April 26, 1994, F & M sent Gilsbar a letter stating it was dissolving and asking for information on the ERP option. The letter explained Mr. Moore was retiring from the practice of law, the remaining three lawyers (Mr. Clary, Mr. O'Brien, and Mr. Reed) would continue practicing, and Mr. Reed was joining another firm and would be picked up on that firm's policy.
On May 17, 1994, Beth Curtis ("Ms. Curtis"), a Gilsbar customer service representative, responded to F & M in writing. Her letter described the premiums applicable to ERP's of varying time periods, including a 36-month tail for a premium of $33,602 which would cover the entire firm, including Mr. *660 Moore.[1] She recommended as an alternative Mr. Moore purchase a separate "Non-Practicing Extended Reporting Period" endorsement for $5,213, in which case the firm's premium would be only $18,766. F & M responded on June 2, 1994, stating the firm wanted to purchase the extended reporting period option effective July 1, 1994, for the indicated premium cost of $18,766, and Mr. Moore would be purchasing a separate tail. The letter also asked for invoices from Gilsbar. In a written response, Ms. Curtis advised Gilsbar did not invoice for such purchases, but confirmed the previously quoted $18,766 premium for the firm and $5,213 premium for Mr. Moore. On June 15, 1994, the firm and Mr. Moore sent checks for these amounts to Gilsbar.
Two days before the policy cancellation date, Gilsbar personnel discovered an apparent miscalculation in the firm's premium and communicated to F & M by telephone and fax the correct premium was $33,602 and therefore an additional payment of $14,836 was due.[2] The Gilsbar representative, Jeffrey Fields ("Mr. Fields") further stated that unless the full premium was paid immediately, the firm's tail coverage would not be put into place when the policy terminated. He warned tail coverage could not be picked up at a later date and emphasized if a gap in coverage occurred, it could never be remedied. Additionally, the applications of two of the individual attorneys for continuing legal malpractice insurance could not be processed until their status with reference to the firm's tail coverage was ascertained. Faced with the impending loss of coverage, F & M paid the $14,836 difference in the premium under protest and filed suit in Baton Rouge City Court to recover this amount.
The trial court found Gilsbar's two written quotations constituted an offer to provide the option at the specified premium of $18,766 and F & M had accepted the offer by remitting payment. At that point a contract was formed, obligating Gilsbar to provide the extended reporting coverage to the firm for 36 months. The judge also found the miscalculation in premium was an error concerning a principal cause of the contract, but he did not rescind the contract. The court's oral reasons for judgment were incompletely transcribed, so it is impossible to determine from the record his precise reasoning on the application of the pertinent Louisiana Civil Code articles on vitiation of consent due to error in the cause. However, he did not rescind the contract, but enforced it by ordering the return of $14,836 to F & M, with legal interest from date of demand. That conclusion, plus the portion of his oral reasons which was transcribed, indicates he must have determined the evidence did not establish F & M knew or should have known the specific premium was a principal cause of the contract. The court denied Gilsbar's motion for a new trial.

STANDARD OF REVIEW
The Louisiana Constitution states the appellate jurisdiction of a court of appeal extends to law and facts. LSA-Const. Art. V, § 10(B). As the facts in this case are not disputed, the doctrine of manifest error is not applicable in appellate review of the trial court's decision. Maryland Casualty Co. v. Dixie Ins. Co., 622 So.2d 698, 701 (La.App. 1st Cir.), writ denied, 629 So.2d 1138 (La. 1993). On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and renders judgment on the record. Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975); Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144, 152 (La.App. 3rd Cir.), writ denied, 565 So.2d 450 (La.1990).

FIRST ASSIGNMENT OF ERROR
Gilsbar contends on appeal the trial court erred in upholding the contract. It argues the premium amount enforced by the court was lower than the rates filed and approved by the Louisiana Insurance Rating *661 Commission ("Commission"); therefore the contract did not have a lawful cause and should not have been enforced. The Louisiana Civil Code requires a "lawful cause" for an obligation to exist. LSA-C.C. art. 1966. "The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." LSA-C.C. art. 1968. All casualty insurance companies are required to adhere to rates approved by the Commission. LSA-R.S. 22:1406(A). Although it is not an insurance company, Gilsbar asserts because it is the agent of the insurance company, it is bound by the same rate filings and could not lawfully quote a discounted premium.
The trial judge did not directly address this issue in his oral reasons for judgment. However, it is obvious he did not find merit in this argument, as he upheld the validity of the contract formed on the basis of the lower premium. This is a legally correct result for several reasons. First, the record is devoid of any evidence from which the court could determine what was filed and approved by the Commission. Gilsbar initially argued the filed and approved rate was the policy provision which stated a 36-month ERP could be purchased for 185% of the firm's last annual premium. But the quoted premiums were all less than 185% of the last annual premium paid by the firm. The policy contained no definition of "annual premium" and Gilsbar's employees and internal documents illustrated how various mathematical adjustments were made to arrive at the "annual premium" upon which the ERP premium was actually based. These computations took into account the firm's claims history, its areas of practice, its size, its participation in continuing legal education, the status of lawyers in the firm as partners or associates, the exit of several lawyers from the firm during the policy year, and other facts particular to the firm. Mr. Fields stated in general terms all of these computations were in accord with factors in the rate schedules filed and approved by the Commission, and the company could not deviate from those rates. However, Gilsbar did not enter these rate schedules into the record or produce anything showing their filing and/or approval. There is nothing the trial court or this court could use to compare the several premium quotations to the "filed and approved" rate schedules to determine whether those quotations were actually loweror perhaps higherthan those schedules. Nothing in the record established the quoted premium was not "lawful."
A second reason supporting the result is there is some documentary evidence in the record which tends to indicate the lower premium rate was computed using the very rate schedules which Gilsbar claims were "filed and approved" by the Commission. In her first letter to F & M on May 17, 1994, Ms. Curtis clearly stated the premium of $33,602 included Mr. Moore and the lower premium of $18,766 did not include him. A worksheet bearing that same date was produced from Gilsbar's business records. It shows the premium calculation for four lawyers, which Gilsbar claims is an accurate computation using "filed and approved" rates. Immediately adjacent to the numeral "4" (referring to the number of lawyers) is a handwritten notation which states, "(3 attys if Moore purchases separately)." That worksheet also contains some calculations which are not within the columns on the form, but appear to have been made on a "sticky note" affixed to the original worksheet. Those calculations include numbers corresponding to the premium amount which would be attributable to three lawyers, plus a claims surcharge, for a total of $10,144. When that total is multiplied by the 185% called for in the policy provision for a 36-month ERP, the resulting amount is $18,766, the amount quoted in Ms. Curtis's letter and paid by the firm. Gilsbar claims this is an unlawful premium because it does not correspond with the rate schedules on file and approved by the Commission. Perhaps, as Gilsbar claims, these numbers were not used properly, but they were derived from the same numbers used by Gilsbar to compute what it asserts is the "correct" and ostensibly "lawful" premium. In other words, the lower premium was computed, apparently for three lawyers, using the "filed and approved" factors. The use of those factors in that way may have been an error in judgment by a Gilsbar employee, but it was based on the same set of numbers as the premium which Gilsbar *662 now claims is due. Based on this record, therefore, there is evidence suggesting the premium enforced by the trial court was indeed based upon the rates and factors which Gilsbar contends were "filed and approved" by the Commission. Thus the trial court did not err in implicitly finding the lower premium was a "lawful" cause for the contract.

SECOND ASSIGNMENT OF ERROR
Gilsbar asserts the trial judge misinterpreted or misapplied the law when he found that although there was error as to a cause without which the obligation would not have been incurred, the contract could still be enforced because that cause was not known to the other party, nor should the other party have been expected to know of it. As the trial judge correctly observed, the enforcement of this contract turns on the application of articles 1948 and 1949 of the Louisiana Civil Code. Those state:
Art. 1948. Consent may be vitiated by error, fraud, or duress.
Art. 1949. Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party.
The jurisprudence has established the rule that a contract may be invalidated for unilateral error as to a fact which was a principal cause for making the contract, where the other party knew or should have known it was a principal cause. DeGravelles v. Hampton, 94-0819 (La.App. 1st Cir. 3/3/95), 652 So.2d 647, 649, writ denied 95-0826 (La. 5/5/95), 654 So.2d 332; Arena v. K Mart Corp., 439 So.2d 528, 530 (La.App. 1st Cir.), writ denied, 443 So.2d 585 (La.1983). Gilsbar admitted it made an error in quoting the premium for the firm's ERP coverage and claimed this error concerned a principal cause, without which it would not have agreed to provide coverage. The trial court agreed. Gilsbar further argued because F & M knew or certainly should have known collection of the premium was its principal reason for entering the contract, article 1949 is applicable.[3] This argument is disingenuous. Gilsbar stated "collection of premium" was the principal cause because anyone buying insurance would surely be expected to know collection of premium was the insurer's primary reason for entering into the agreement. But in fact, Gilsbar did not just want collection of premium, Gilsbar wanted a specific premium amount of $33,602; this was the principal cause of the contract. If Gilsbar did not get that specific amount, it was not willing to provide the coverage. But it could hardly expect F & M to know collection of $33,602 was the principal cause when its own employee quoted a different amountnot once, but twicenot just orally, but in writingand in fact, recommended the alternative amount. In addition, the record shows a complex series of mathematical computations had to be made and these were made on the basis of underwriting information which was not known to F & M. An internal memorandum to Ms. Curtis acknowledged confusion concerning the process. The trial court correctly found F & M did not know and should not have been expected to know collection of $33,602 was Gilsbar's principal cause, without which it would not provide the coverage.
This conclusion is supported by the jurisprudence. A case involving a specific monetary amount as the principal cause is Twin City Pontiac, Inc. v. Pickett, 588 So.2d 1125 (La.App. 2nd Cir.1991). There the court found the buyers of an automobile had been shown the specific amount which was required by the car dealership to sell them a car. However, the final sales agreement contained a clerical error which reduced the purchase price by $2000. Because the court found the buyers knew or should have known the specific amount which was due, it ordered them to pay the additional $2000. Similarly, in the Arena v. K Mart case, the court found the buyers had seen and discussed the correct price of a television before trying to buy it for a significantly reduced price, and determined they knew or should have known of the correct price. In Franklin *663 State Bank v. Herring, 608 So.2d 643 (La.App. 2nd Cir.1992), writ denied, 610 So.2d 800 (La.1993), the bank prepared a note calling for 84 monthly payments of $239.98, including interest. The disclosure statement showed a variable rate of interest of "FSB Prime" plus 2.5% per annum from date. When the borrower made the 84th payment and asked for the paid note, the bank informed her it had made a mistake on the interest. The bank eventually sued for 12 additional monthly payments which it claimed were required to pay the note in full. The court found the record reflected even bank personnel were confused concerning the computation of the variable interest and the borrower certainly could not have known 84 payments of $239.98 would not pay off the note. The court decreed the debt was satisfied by the borrower's payments.
Unlike the Twin City and Arena buyers, the law firm in the instant case did not see one premium in an initial document, then a reduced premium in a subsequent document which might have alerted them to the possibility of an error. The firm was quoted alternative premiums and given a choice between them. As in the Franklin State Bank case with its complicated interest calculations, the record here reflects a complex system was used by Gilsbar to determine the premium for the ERP. Those computations significantly adjusted the "annual premium" amount, making it impossible for anyone to compute it simply by using the factor of 185% as stated in the policy provision. Ms. Curtis was a trainee whose work was being reviewed by a supervisor, but still the error went unnoticed until after the premium was communicated twice to the firm. Although the premium difference was considerable, the record showed the attorney placing coverage discussed the difference with Ms. Curtis. They conjectured a reasonable explanation having to do with reduced risk as a result of Mr. Moore obtaining separate coverage, and she confirmed the requested coverage was available for the premium amount chosen by the firm.
Under these circumstances, the court did not err in finding F & M did not have knowledge of and should not have been expected to know the principal cause, that being the specific premium amount without which Gilsbar would not have entered the agreement. Accordingly, the error did not vitiate consent and the contract was enforceable.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. All costs of this appeal are to be paid by Gilsbar.
AFFIRMED.
NOTES
[1] The letter described premiums for 12 months, 24 months, 36 months, and unlimited extended reporting periods. The 36-month period was chosen, and it is this period to which all subsequent discussions refer.
[2] The $5,213 paid by Mr. Moore for his coverage was apparently the correct amount, as Gilsbar required no additional premium from him.
[3] However, Gilsbar does not want the contract invalidated or rescinded, which is the usual remedy when consent is vitiated by error. Gilsbar wants to provide coverage, but only for the higher premium amount of $33,602.