719 So.2d 79 (1998)
ECHO, INC., et al.
v.
POWER EQUIPMENT DISTRIBUTORS, INC.
ECHO, INC.
v.
K & D RENT-ALL AND HARDWARE, INC.
Nos. 96 CA 1771, 96 CA 1772.
Court of Appeal of Louisiana, First Circuit.
August 7, 1998.
*82 Daniel A. Smith, Marie Healey, Healey & Smith, New Orleans, for Plaintiff-Appellant/Appellee Echo, Inc.
Harry J. Philips, Jr., J. Ashley Moore, Taylor, Porter, Brooks & Phillips, Baton Rouge, for Defendant-Appellant/Appellee Power Equipment Distributors, Inc.
Before CARTER, LeBLANC and PARRO, JJ.
PARRO, Judge.
Echo, Inc. ("Echo") and its Louisiana distributor, Power Equipment Distributors, Inc. *83 ("Power"), both appeal a judgment in these consolidated actions that dismissed all claims in the main and reconventional demands. For the following reasons, we affirm.

Facts and Procedural History
Echo, a Delaware corporation with its principal office in Illinois,[1] imported and distributed lawn and garden equipment, such as power chain saws, blowers, hedge trimmers, grass and weed trimmers, and similar tools. It also manufactured and sold accessories and replacement parts for its equipment. Echo established a network of distributors to whom it sold Echo brand products; these distributors in turn sold Echo products to various retail dealers.
In January 1984, Echo executed a distributorship agreement with Power, which was a Louisiana corporation established for the purpose of distributing Echo products in southern Louisiana. Power was created by Ernie Butitta ("Butitta"), who was part-owner and operator of K & D Rent-All and Hardware, Inc. ("K & D"), a retail hardware store in Baton Rouge that sold Echo equipment. In connection with the distributorship agreement, Power assigned its accounts receivable to Echo, executed collateral chattel mortgages on its inventory of Echo products, and pledged the collateral chattel mortgage notes to Echo.
For several years, Echo financed all of Power's purchases on open account, as it did for all its distributors. However, payments on open accounts lagged well behind sales, so in 1988, Echo established a floor plan financing arrangement through Echo Financial Services, Inc. ("EFSI"). EFSI was supervised by Echo management, but was financed by and was a trade name for Mitsui & Co. Financial Services, Inc.[2] In connection with the floor plan financing, Power executed a Distributor Security Agreement ("security agreement"), a general assignment of accounts receivable to EFSI, and a pledge of a collateral chattel mortgage note secured by a collateral chattel mortgage on all Echo product inventory. Echo continued to finance Power's parts and accessories on open account, but all new equipment was put on the floor plan financing system. Besides the distributorships, some retail dealers were also extended floor plan financing through EFSI. Power executed a "Distributor Recourse Agreement" ("recourse agreement") in favor of EFSI, whereby EFSI had recourse against Power for obligations stemming from floor plan financing of sales Power made to its network of retail dealers.
Echo was aware that, like many of its other distributors, Power was woefully undercapitalized when it was established. Butitta started Power with a $15,000 bank loan, a $150,000 letter of credit, and some promise of financial help from his stepfather. Although Power's sales volume and market penetration were excellent, to some extent, Power achieved that volume at the expense of its profit margin. Accordingly, Power never operated on a large enough profit margin to build capital and repay the debt it incurred for initial inventory and start-up expenses.
Echo generally waived all interest on its open accounts for new distributors for the first year; Power's interest was waived totally for the first two years, and periodic adjustments were made beyond that time also. Despite the improved cash flow available to Power if its retail dealers used the EFSI floor plan arrangement, Power never set up enough of the dealers in its network on the floor plan to obtain the full benefits of that arrangement. Power also tended to "overbuy," resulting in slow and incomplete inventory turnover. As a result of these problems, Power's debt to Echo and EFSI continued to grow. By early 1991, Power's balance with EFSI was $732,000 and its credit limit was $750,000. At that point, $239,000 was also owed to Echo on open account, although no interest had been charged on that account since mid-1987.
*84 By November 1991, Echo determined it could no longer maintain its relationship with Power and on November 22, 1991, notified Power it was terminating the agreement, effective in sixty days. During December, Echo took back all of its inventory from Power, and credited Power's Echo and EFSI accounts with certain amounts attributable to the surrendered inventory, as described in the distributorship agreement.
After terminating the relationship with Power, Echo and Mitsui, doing business as EFSI, filed suit against Power, seeking to recover $95,398.99 allegedly still owed Echo on open account and $262,731.92 allegedly owed to EFSI on its floor plan financing and dealer recourse agreements.[3] Power answered, denying liability to Echo and EFSI, and reconvened, seeking recovery of expenses incurred in the installation of a computer system required by Echo, reimbursement of all interest paid to Echo, and damages for wrongful termination of the distributorship agreement.
On the basis of assignments of accounts receivable between Echo and Power, Echo filed a separate suit on open account against K & D, seeking to recover $88,865.49 owed by K & D to Power for products purchased from Echo.
These suits were subsequently consolidated. Following the trial, the trial court entered judgment in favor of Power and K & D on Echo's main demands and dismissed those demands with prejudice. With regard to the reconventional demand filed by Power, the trial court entered judgment in favor of Echo and EFSI and dismissed Power's demands with prejudice. Power and Echo appeal.
On appeal, Power contends the trial court committed reversible, legal error in (1) concluding that an undated, unexecuted document of release extinguished its claim for computer losses, (2) failing to find Echo breached and wrongfully terminated the distributorship agreement, (3) failing to find Echo breached and wrongfully terminated Power's purchase orders for the Spring 1992 booking, (4) concluding Echo was not required to provide Power with notice of intent to terminate the distributorship agreement and an opportunity to cure any alleged performance deficiencies, (5) failing to determine that Echo breached its promise to assist Power in maximizing its business opportunities and in reselling Echo products, as required by the distributorship agreement, (6) failing to award Power damages for wrongful seizure and tortious conversion in an amount equal to the replacement costs of misappropriated inventory, (7) failing to award Power damages for the wrongful cancellation of its purchase orders for the Spring 1992 booking, and (8) failing to assess attorney fees and costs against Echo under the Louisiana Dealer Agreement Act, LSA-R.S. 51:483, for Echo's breaches of the distributorship agreement and failure to comply with notice and opportunity to cure requirements of the agreement.
On the other hand, Echo contends the trial court erred in (1) concluding the voluntary return of inventory by Power triggered the provisions of the deficiency judgment act, and (2) excluding from evidence certain accounting records that more accurately portrayed the sums Power owed to Echo.

Standard of Review
The appellate court's review of factual findings is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it *85 determines the trial court's finding was clearly wrong. See Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
Appellate review of questions of law is simply to determine whether the trial court was legally correct or legally incorrect. See O'Niell v. Louisiana Power & Light Co., 558 So.2d 1235, 1238 (La.App. 1st Cir.1990); Minor v. Casualty Reciprocal Exchange, 96-2096 (La.App. 1st Cir. 9/19/97), 700 So.2d 951, 953, writ denied, 97-2585 (La.12/19/97), 706 So.2d 463. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and renders judgment on the record. See Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975); Franklin & Moore v. Gilsbar, Inc., 95-1520 (La.App. 1st Cir. 5/10/96), 673 So.2d 658, 660.

Breach of Promise to Provide Assistance
Power contends the trial court committed reversible error in failing to determine that Echo breached its promise to provide assistance to Power, as required by the distributorship agreement. Section 3.3 of the distributorship agreement pertaining to business assistance set forth Echo's promise in this regard:

Business Assistance. [Echo] shall provide assistance and support to [Power] in an effort to maximize [Power's] business opportunities in the resale of the Products of [Echo], and thereby enhance [Power's] efforts to maintain and build [its] business in a manner that will more effectively serve and retain the goodwill of all dealers, purchasers and users of Products. However, the provisions of this Agreement shall not be construed as authorizing or reserving to [Echo] any right to exercise any control or direction over the operations or activities of [Power] in connection with its business, it being understood and agreed that the entire direction and control of such operations and activities shall remain with [Power].
The question of whether Echo provided business assistance to Power is essentially a factual inquiry; therefore, this court's review is limited to examining the record for manifest error on the part of the trial court. The record shows Echo did many things to assist Power, including (1) helping Power acquire other product lines, so it could increase sales volume, spread fixed costs, and turn a profit, (2) repeatedly forgiving the payment of accrued interest on Power's open account, when the forgiveness of interest for other distributors generally did not extend beyond the first year of operation, (3) moving excess and/or slow moving inventory to other distributors or back to Echo, (4) arranging floor plan financing through EFSI for Power's retail dealers, to help resolve Power's cash flow problem, and (5) expanding Power's territory beyond its initial boundaries, to include northern Louisiana and part of Mississippi.
It is obvious to this court that during the eight years Power did business, Echo went to great lengths to help Power grow and succeed. Accordingly, the trial court did not err in failing to find a breach of this contractual duty on the part of Echo.

Computer System Losses
However, Power specifically claims Echo breached its obligation to provide business assistance with respect to a computer system that Echo required Power to purchase. Power contends it is entitled to recover approximately $58,000 it lost in connection with this system. The trial court found Echo did require Power to purchase a particular computer system, and this system and related expenses were a total loss for which Power was entitled to recover. However, the court further determined the record showed this claim had been fully satisfied and paid. Power argues the trial court legally erred in concluding that an undated release document *86 signed by Butitta, but not executed by anyone at Echo, extinguished its claim for computer-related losses.[4]
We note first that the trial court's written reasons for judgment indicate that, contrary to Power's contention, the trial court did not base its conclusion solely on this document. Rather, the trial court observed that the existence of this release was one of several evidentiary facts supporting Echo's position that the computer claim had been extinguished by significant interest adjustments in 1987 and 1988.
Butitta acknowledged that Echo waived all interest charges on Power's open account balances for the first two years. He also said that several years later, when about $110,000 in interest had accumulated on the account, the parties "compromised" this accrued interest claim by accepting $33,000 from Power in 1988. Butitta's testimony did not connect this payment with Power's claims for reimbursement of expenses relating to the computer.[5]
However, Eugene Stahnke, who held various management positions with Echo during its relationship with Power, testified that he negotiated the interest adjustments as director of legal and financial services for the company. One of the reasons Echo agreed to forgive Power's accumulated interest charges in 1987 and 1988 was because of the expenses Power had incurred as a result of the computer and software installation. He said Echo had tried to help resolve the software problems, but knew that the system, which was put in place during 1985, had caused more problems for Power than for other distributors who were also using it. In 1987, Echo forgave approximately $56,000 in delinquency charges for 1985 and 1986.[6] Stahnke commented, "So we took into consideration... in 1987 when the write-off was eventually made to handle the computer expense as part of this write-off." In 1988, Echo accepted $33,000, which paid only half of 1987's delinquency charges. Stahnke testified concerning this write-off, "And again, the factors for that were his market development to that point, the problems with the computer system, and it was a general settlement of all problems to that point."
The record does contain the previously mentioned undated release executed by Butitta, in which Power released Echo from any and all claims for alleged computer system losses. This document provided that Power released Echo from any and all manner and kind of liability arising directly or indirectly by reason of, or in connection with the recommendations of Echo that Power purchase a Sperry 5000 SeriesModel 40 computer system and accompanying software from Precision Systems and arising directly or indirectly by reason of, or in connection with, the subsequent purchase by Power of said computer system and accompanying software.
Absent an enforceable agreement to adjust interest for some other reason or any proof *87 to the contrary, we conclude that the record contains sufficient evidence to support the trial court's factual finding that the interest adjustments were made, at least in part, to offset Power's claimed losses due to the computer system. We interpret the court's action as judicial recognition that compensation had taken place between these parties, by mutual agreement. Compensation takes place by operation of law when two parties owe to each other sums of money identical in kind, and these sums are liquidated and presently due. In that case, compensation extinguishes both obligations to the extent of the lesser amount. LSA-C.C. art. 1893. Compensation of obligations may take place also by agreement of the parties, even though the requirements for compensation by operation of law are not met. LSA-C.C. art.1901; see Johnston v. Alloy Distributors, Inc., 536 So.2d 526, 528 (La.App. 1st Cir.1988). Additionally, although the obligation claimed in compensation is unliquidated, the court can declare compensation as to that part of the obligation that is susceptible of prompt and easy liquidation. LSA-C.C. art.1902; see Utley-James of Louisiana, Inc. v. State, Div. Of Admin., Dept. of Facility Planning and Control, 94-2504 (La.App. 1st Cir. 10/6/95), 671 So.2d 473, 478.
The trial court had the authority to declare the debts compensated when he found liquidated damages were due for the computer losses. Accordingly, after careful review of the record, we conclude the trial court did not err in dismissing Power's claim for computer losses on the basis that it had been fully satisfied and paid by the forgiveness of interest.

Obligation to Finance
Power contends Echo breached the distributorship agreement in various other respects, including the abrupt decision to discontinue sales on credit, for which Power is entitled to damages. Echo claims it was not obligated to continue extending credit to Power. Further, Echo submits that even if this court were to determine the distributorship agreement was breached, any such breach could not have resulted in a loss to Power, given Power's desperate financial condition.
Initially, we note that section 3 of the distributorship agreement obligated Echo to sell instruction manuals and advertising materials to Power, as well as to provide assistance and support to maximize Power's business opportunities. Section 5 of the agreement required Echo to sell products to the distributor and set forth the procedure for pricing and acceptance of those orders. Section 6 detailed Echo's warranty responsibilities with respect to products which it supplied. Conspicuously absent from these distributorship agreement obligations, as noted by Echo, was any requirement to extend credit to Power.
EFSI's obligation to finance with respect to the floor plan arrangement was governed by the security agreement between Power and EFSI, dated January 25, 1988. Pursuant to this agreement, EFSI was obligated to finance such amounts that it, in its sole discretion, decided to furnish. Although this agreement provided for a method of financing, the decision to finance was totally within EFSI's discretion.
Based on these facts, we conclude the record provides a reasonable basis for the trial court's finding that Echo and EFSI were not obligated to continue financing Power's purchases of Echo products. Furthermore, this finding was not clearly wrong.

Wrongful Cancellation of Purchase Orders
Power contends the trial court committed reversible, legal error in failing to find Echo wrongfully terminated its purchase orders for the spring 1992 booking, in violation of the distributorship agreement, and in failing to award damages for that breach. Power claims Echo accepted its purchase orders for the spring 1992 booking when they were placed. The record shows these purchase orders were received by Echo before the termination of the distributorship agreement, and Echo did not cancel the spring 1992 booking in writing. However, Echo maintains receipt alone did not constitute acceptance under the distributorship agreement, and it never accepted the order. The trial court did not state any conclusion concerning this particular argument, but denied any *88 damages for lost business opportunity, including the 1992 sales.
Section 5 of the distributorship agreement addressed Echo's obligations with respect to purchase orders, prices, and terms of payment. Section 5.3 provided:

Acceptance of Orders. All orders for Products shall be subject to acceptance by Company at Northbrook, Illinois. After acceptance by Company, no order may be cancelled by Distributor without the written consent of Company.
In support of its argument regarding this assignment of error, Power also directs this court's attention to section 5.1 of the distributorship agreement, which provides in part that the distributorship agreement shall be deemed part of each purchase order accepted by Echo. Based on this provision, Power asserts the 60-day written notice provision in section 8 of the distributorship agreement applied to the cancellation of previously placed purchase orders. Power argues that Echo had a separate contractual obligation to cancel a purchase order once it was accepted. Since written notice of cancellation of the purchase was not given, Power submits Echo's actions violated the distributorship agreement.
According to John Gibson, who at the time of trial was Echo's senior vice-president of administration, the filling of orders required availability of product and credit approval. Thus, the mere fact that the goods requested by Power were available for shipment was insufficient. The proposed means of payment for such shipment was also considered by Echo in determining whether to accept a purchase order. Gibson testified that, by the time the spring 1992 booking would have been shipped, Power had no means of paying for the product because it could not pay cash on delivery and Echo and EFSI would no longer extend credit to Power.
Donald Bartelt, who was senior vice-president of sales and marketing for Echo, testified he never made a decision to stop supplying Power from a marketing standpoint. He believed Echo had a very good marketing relationship with Power. However, the financial aspect of their relationship presented a problem because Echo could not continue carrying the delinquent open account balance and Power had insufficient capital to obtain outside financing.
Stahnke testified that, because of the amount past due on open account to Echo and on the floor plan account to EFSI, Echo decided in early 1991 that it had to evaluate every purchase order to determine whether it would accept it and ship goods to Power. According to Stahnke, Echo was particularly reluctant to release any new equipment inventory to Power because of Power's tendency to overstock. Shipments to Power were monitored to insure goods would be quickly re-sold to dealers, so these goods would not remain in Power's inventory and accrue floor plan interest.
The evidence reveals that, by the fall of 1991 when Echo would have received Power's purchase orders for the spring 1992 booking, Power no longer had any available credit line with Echo or EFSI. Because it had no obligation to continue financing Power, Echo was free to refuse acceptance of Power's purchase orders on a credit basis. The notice provision of section 8 may very well apply to the cancellation of purchase orders accepted by Echo. However, in light of the facts of this case, we find it unnecessary to resolve this issue. Since Power could not pay for the shipment in cash, and credit approval was not given by Echo with respect to the spring 1992 booking, we conclude Power failed to prove Echo had accepted its purchase orders, so as to trigger the notice provisions of section 8.1, if applicable. Therefore, we find no error, legal or otherwise, in the trial court's determination that Echo did not violate the distributorship agreement when it failed to fill Power's purchase orders for the spring 1992 booking.

Termination of the Distributorship Agreement
Power argues the trial court committed reversible, legal error in (1) failing to find Echo breached and wrongfully terminated its distributorship agreement with Power, (2) concluding Echo was not required to provide Power with notice of intent to terminate the distributorship agreement and an opportunity *89 to cure any alleged deficiencies in performance, and (3) failing to assess attorney fees and costs against Echo under the Louisiana Dealer Agreement Act, LSA-R.S. 51:481 et seq. Echo contends there was ample factual support for the trial court's conclusion that immediate termination was appropriate under the distributorship agreement and under Louisiana law because of Power's defaulted financial obligations on the Echo open account and on the EFSI floor plan account.
The distributorship agreement confected by Echo and Power, in pertinent part, provided:
VIII. TERM, RENEWAL AND TERMINATION
8.1 Term and Renewal. This Agreement shall take effect on the commencement date as set forth on the title page hereof and shall continue in full force and effect until November 30, next following the commencement date and shall automatically renew unless notice of termination is given in accordance with state statutes. If state statutes are not specific, ECHO will give sixty (60) days written notice of termination previous to November 30. If [notice of] termination is not given, renewal is for an additional term of one (1) year. When renewed, the provisions of the Agreement shall continue in full force and effect.
8.2 Termination. This Agreement may be terminated as follows:
A. By Distributor with or without cause upon a minimum of sixty (60) days advance notice in writing;
B. By Company with or without cause upon a minimum of sixty (60) days advance notice in writing;
C. By Company immediately upon giving written notice, in the event that[:]
* * * * * *
(iii) Distributor, or if a partnership, any partner of Distributor shall admit insolvency;
* * * * * *
(xi) Any non-payment of bank drafts delivered by Distributor to Company in payment for Products; non-payment of any check issued by the Distributor; or if Distributor becomes more than ninety (90) days in arrears in payment of its account to [Company].
* * * * * *
IX. GENERAL PROVISIONS
* * * * * *
9.2 Notice. All notices permitted or required hereunder shall be in writing, shall be executed by an officer of Company or by any executive officer, partner or principal of Distributor, and shall be effective as of the date on which deposited in the United States mails in a properly stamped and addressed envelope, except that any such notice actually or personally delivered to an officer of Company, or to any executive officer, partner, or principal of Distributor shall be effective as of the date of such delivery. All such notices shall be sent to the respective parties at the address set forth on the title page hereof or to such other address as may be designated by either party from time to time.
It is clear from the record that Power stayed over 90 days in arrears virtually throughout its relationship with Echo. Furthermore, Butitta admitted that Power was insolvent at the point at which the relationship was terminated and had no possible hope of obtaining financial relief or support from any source. Based on Butitta's testimony and other record evidence of Power's insolvency, we find no error in the trial court's finding that under the terms of section 8.2(C) of the distributorship agreement, Echo had the right to terminate their relationship immediately.
However, Power argues the purported notice of termination was legally deficient, in that it (1) was not signed by an officer of the company and (2) was provided only eight days before November 30, in contravention of Echo's obligation to give sixty days written notice of termination prior to November 30 if state statutes were not specific. Power contends because the notice of termination was deficient, the distributorship agreement renewed for another year on November 30, *90 1991, thereby requiring notice of termination once the renewal took place.
The record reflects that during a meeting on November 20, 1991, Echo officers orally advised Butitta of the decision to terminate the relationship. Echo followed up this meeting by sending a letter of termination dated November 22, 1991, signed by Paul Scholl, who at that time was Echo's national sales manager. At trial, Gibson conceded Scholl was not an officer of Echo. This letter stated, in pertinent part:
... ECHO, INCORPORATED, under the terms of the Distributor Sales and Service Agreement signed by Power Equipment Distributors 1/12/84, is giving you sixty days notice of Echo's intention to terminate Power Equipment Distributors as ECHO's distributor for the State of Louisiana and Southern Mississippi.
* * * * * *
After the sixty day notification period has expired, [u]nder Section 8.3 of the Distributor Sales and Service Agreement dated 1/12[/]84, ECHO, INCORPORATED will repurchase from Power Equipment Distributors all current ECHO products sold to Power Equipment Distributors and presently in Power Equipment Distributors' inventory. Details of the repurchase and close down procedure are as follows:

* * * * * *
... The close down is to be completed in two days and will require a minimum of two Power Equipment Distributors' employees to assist. Based on our verbal discussion of 11/20/91, it is preferred this action take place as soon as possible. We are proposing the week of 12/2/91 or 12/16/91. You are requested to confirm back to ECHO, INCORPORATED in writing, no later than 11/26/91 your acceptance of one of these dates or submit an alternative....
Butitta admitted receiving this letter, but did not send written confirmation or acceptance of either of the suggested dates or other terms.
The sixty-day notice period is specifically required by the distributorship agreement only for non-renewals under section 8.1 or terminations with or without cause under sections 8.2(A) or 8.2(B). In contrast, no such advance notice is required for terminations under section 8.2(C), for which the company may terminate the agreement "immediately upon giving written notice...." Since Echo was authorized to impose immediate termination in this case, the notice dated November 22, 1991, was effective as of the date Echo deposited it in the United States mail, which was before the distributorship agreement would have automatically renewed.
However, because the November 22, 1991 letter was not signed by an officer of Echo, Power contends the notice given was ineffective in terminating the agreement. We disagree. The decision to terminate was made by several Echo officers and managerial employees, who orally conveyed that decision to Butitta at the November 20, 1991 meeting. Accordingly, Butitta had notice directly from Echo's officers, which was followed up by the written notice signed by Echo's national sales manager. We conclude that, because Butitta had direct notice of the termination decision from corporate officers, Echo's technical breach of this provision did not invalidate the written notice of termination. Even if this court assumed this technical deficiency was fatal and termination was improper, the record reveals that if the distributorship relationship had continued, Power could not have paid for the products required to continue in business. Given its financial condition at this point, Power would only have been entitled to purchase Echo products through a cash on delivery basis. Power did, in fact, continue to conduct some business with Echo on this basis, but was financially unable to buy new inventory. Therefore, the trial court's implied finding that the termination notice was valid was supported by the record and not manifestly erroneous.
The trial court was also correct in denying Power any recovery under the Louisiana Dealer Agreement Act, LSA-R.S. 51:481 et seq., which governs the repurchase of lawn and garden equipment by a wholesaler from its distributor. The applicable *91 statutes specify certain notice and delay requirements when such an agreement is terminated, and were amended in 1991, effective prior to the termination notice sent by Echo. Under amended LSA-R.S. 51:482(C), the notice and right to cure provisions are not required if the reason for termination is one of certain enumerated violations. LSA-R.S. 51:482(B)(5) specifies one of these violations, namely when a distributor has substantially defaulted under a chattel mortgage or other security agreement. The trial court found Power was clearly in default of its obligations to Echo and EFSI under the collateral chattel mortgages, and therefore the notice and right to cure provisions were inapplicable to this termination. That finding is supported by the record, and the trial court correctly applied the Louisiana statutes to these facts.

Deficiency Judgment on Debt Secured by Collateral Chattel Mortgages

A. Documents
The parties deleted section 7 of the distributorship agreement pertaining to the granting of a security interest under the Uniform Commercial Code ("U.C.C."), because Louisiana had not yet adopted the security interest provisions of the U.C.C. Therefore, to secure its future obligations to Echo, on January 16, 1984, Power executed a pledge of a $325,000 collateral chattel mortgage note, secured by a collateral chattel mortgage on all Power's present and future inventory of Echo products. A second collateral chattel mortgage covering similar inventory was granted by Power in favor of Echo on May 10, 1985. This collateral chattel mortgage secured a $1,000,000 collateral chattel mortgage note, which was also pledged to Echo.
In the collateral chattel mortgage notes, Power, as maker, waived presentment for payment, demand, notice of nonpayment, protest, notice of protest, and all pleas of division and discussion. The 1985 collateral chattel mortgage provided:
In addition to all other remedies provided herein or pursuant to law, [Echo] is further authorized, at its option, to cause the Inventory to be sold at private sale in the event of default in the due payment of the Note and/or any of the Obligations or in the observance and performance of any covenant or agreement to be observed or performed by [Power], and for such purpose [Power] hereby appoints [Echo] as its duly authorized attorney-in-fact with full power in [Power's] name, place and stead and with full power of substitution to execute any and all instruments which are necessary or appropriate to transfer title to the said Inventory at any such private sale.
Pursuant to paragraph 13(a) of the security agreement between Power and EFSI, an event of default occurred if Power failed to pay or perform any obligation, covenant, or liability contained or referred to in the security agreement. Upon the occurrence of an event of default, Power granted EFSI the following rights in paragraph 14(a):
[EFSI] shall have the right to repossess the Inventory and also any and all rights available under the Uniform Commercial Code, including, without limitation, the right to terminate any commitment to provide advances to you and to declare any and all unpaid balances arising out of any and all of [Power's] obligations or liabilities to [EFSI], whether past, present or future, direct or indirect, matured or unmatured, liquidated or unliquidated, immediately due and payable without notice to or demand on [Power]. [Power] irrevocably authorize[s] [EFSI] or [its] agent to enter [Power's] premises to take possession of and remove the Inventory and release[s] [EFSI] from any and all liability with respect to such entry or removal. [Power] shall in case of default, if [EFSI] so request[s], assemble and deliver the Inventory, at [its] expense, to a place to be designated by [EFSI]. [Power] shall pay all of the costs [EFSI] incur[s] in the enforcement of any of [Power's] obligations to [EFSI] on the collection of any liabilities owed to [EFSI] by [Power], including, without limitation, costs, expenses, and reasonable attorneys' fees. [Power] waive[s], to the fullest extent permitted by law, any right to judicial process and any right to any hearing, proceeding or notice prior to disposition of the Inventory or any part thereof. If any notification of intended *92 disposition of any of the Inventory is required by law, such notification shall be deemed reasonably and properly given if mailed by ordinary mail at least ten (10) days before such disposition, postage prepaid, addressed to [Power], either at [Power's] address shown in this Agreement, or at such other address as [Power] may have designated in writing.
Paragraph 21 of the security agreement directs that Louisiana law shall apply with respect to the perfection of security interests relating to collateral located in this state.
Apparently realizing that Louisiana law still did not allow the use of U.C.C.-type security agreements, EFSI required Power to execute a collateral chattel mortgage affecting its Echo product inventory to secure its floor plan financing debt. This collateral chattel mortgage, which was executed on February 15, 1988, secured a $1,000,000 collateral chattel mortgage note, which was pledged to EFSI. Like the 1985 collateral chattel mortgage Power had granted in favor of Echo, this collateral chattel mortgage contained a provision authorizing private sale in the event of default.

B. Applicable Law
A deficiency judgment is a judgment rendered in favor of a creditor for the difference between the amount of a debt and the amount realized in a judicial (public) sale held for the satisfaction of that debt. University Properties Corporation v. Fidelity National Bank of Baton Rouge, 500 So.2d 888, 892 (La.App. 1st Cir.1986), writ denied, 501 So.2d 762 (La.1987). The rules governing deficiency judgments in Louisiana are set forth in LSA-C.C.P. arts. 2771 and 2772 and LSA-R.S. 13:4106 et seq., the Deficiency Judgment Act. University Properties Corporation, 500 So.2d at 892.
Prior to the sale, the property seized must be appraised in accordance with law, unless appraisal has been waived in the act evidencing the mortgage, the security agreement, or the document creating the privilege and the plaintiff has prayed that the property be sold without appraisal, and the order directing the issuance of the writ of seizure and sale has directed that the property be sold as prayed for. LSA-C.C.P. art. 2723.[7] The Deficiency Judgment Act requires an appraisal prior to judicial sale if the creditor is to preserve his right to pursue the debtor for any unsatisfied portion of the debt. LSA-R.S. 13:4106. LSA-R.S. 13:4106(A) provides:
Unless otherwise provided by law, if a mortgagee or other creditor takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency, except as otherwise provided by law or as provided in the next subsection.
The purpose of the Deficiency Judgment Act is to protect a debtor from an overreaching creditor. It was intended to prevent the inequity inherent in a creditor foreclosing on a debtor's property without appraisal, buying the property in for a low price, and thereafter obtaining a personal judgment against the debtor for a greater amount than if the property had been sold pursuant to a valid appraisal. First National Bank of Houma v. Bailey, 583 So.2d 559, 563 (La.App. 3rd Cir.1991); University Properties Corporation, 500 So.2d at 892. The debtor protection policy of the Deficiency Judgment Act requires strict compliance with its provisions because a deficiency judgment is a harsh remedy; otherwise, the debt stands fully satisfied and the debtor is personally discharged. University Properties Corporation, 500 So.2d at 893.
However, a creditor retains deficiency judgment rights when the parties consensually agree to assign a reasonably equivalent *93 value to the secured property, in lieu of an appraisal. LSA-R.S. 13:4108.1(A). LSA-R.S. 13:4108.1(A) provides:
As an exception to R.S. 13:4106 and 4107, if a mortgagee or other creditor holds a mortgage, pledge, security interest, or privilege which secures an obligation in a commercial transaction, the mortgagee or other creditor may collect from or pursue any debtor, guarantor, or surety for a deficiency judgment on the secured obligation whether or not the mortgagee or other creditor has foreclosed on all or any of the property and sold such property at a judicial, public, or private sale, with or without appraisal, regardless of the minimum bid, and whether or not the mortgagee or other creditor has acquired such property from any debtor, guarantor, or surety pursuant to a complete or partial dation en paiement. However, other than with regard to a secured transaction subject to Chapter 9 of the Louisiana Commercial Laws, a mortgagee or other creditor may not pursue any debtor, guarantor, or surety for more than the secured obligation, minus the reasonably equivalent value of the property sold.
Under LSA-R.S. 13:4108.1, any means of disposing of the collateral is viewed as an acceptable way to reduce the debt if the parties agree to do so and agree upon the reasonably equivalent value of the property. First National Bank of Houma, 583 So.2d at 564. "Reasonably equivalent value" is defined in LSA-R.S. 13:4108.1(B)(2) as:
the value that the owner and the mortgagee or other creditor of the property being sold or otherwise disposed of agree to attribute to the property for the purposes of reducing the secured debt.
The parties must agree on the value of the property being sold, regardless of whether the property is disposed of by public sale with or without appraisal or whether transferred to the creditor by complete or partial dation.[8]Atkinson v. Sumrall, 598 So.2d 1166, 1168 (La.App. 1st Cir.1992); see First National Bank of Houma, 583 So.2d at 564. This statute fosters leniency by the creditor and allows the debtor freedom to contract for beneficial debt reduction. The creditor is still entitled to a deficiency judgment, however, only for the amount of the secured debt, less the reasonably equivalent value accorded the property by prior agreement of the creditor and debtor. See First National Bank of Houma, 583 So.2d at 564.
LSA-R.S. 13:4108.1 is inapplicable where the parties have not entered into a debt reduction agreement or agreed to attribute a value to the property for this purpose. Such an agreement is "crucial" and must be confected prior to the sale. In the absence of such an agreement, the statute is inoperative. Citizens Savings and Loan Association v. Kinchen, 622 So.2d 662, 665 (La. 1993). If the parties fail to agree, the creditor is still entitled to foreclose through executory process, however, in such event, the stringent rules prescribed by the Deficiency Judgment Act apply. First National Bank of Houma, 583 So.2d at 564.

C. Application of Law to Facts
Power contested Echo's right to a deficiency judgment under the collateral chattel mortgages granted to Echo and EFSI because of their failure to foreclose and sell the mortgaged goods at public sale with appraisal. The trial court agreed and held that Echo forfeited its rights to a deficiency judgment because (1) the returned goods were not sold at public sale with appraisal as required by LSA-C.C.P. arts. 2721 et seq. and LSA-R.S. 13:4106 et seq. and (2) there was no dation, nor did Power give *94 voluntary assent to an agreed price or reasonably equivalent value of the goods returned to Echo, as required by LSA-R.S. 13:4108.1. Echo has appealed this ruling.
In the termination letter Scholl sent Power in November 1991, certain proposed terms for the repurchase of Power's inventory were included. The letter stated all new, boxed, and unused whole goods would be repurchased at the price Power paid Echo, accessories at the price Power paid Echo, and current parts at 1991 list price less 55 percent, with Echo waiving its 15 percent restocking charge. During the week of December 16, 1991, Dave Dalton, the regional manager, flew to Baton Rouge. He and some other Echo personnel stayed about four days packing the inventory for shipment. They were unable to complete the process, so Power's employees finished packing and eventually loaded the inventory on trucks for return to Echo.
Echo treated the surrender of inventory as a return. Echo and Power's representatives counted units, accessories, and parts as they were loaded. Gibson testified the returned goods were credited to Power's account at the prices described in the distributor agreement and the termination letter. On some items, Power received a credit for more than the amount it had paid Echo; on a few items, no credit at all was given. All of the returned inventory was ultimately transferred to another Echo distributor in Florida. For some of the new equipment, the selling price to that distributor exceeded the repurchase price credited to Power's account. At trial, other than general testimony concerning the credits given to Power, Echo did not present any evidence Power agreed to the value of its equipment and parts inventory.
Butitta admitted to surrendering the inventory, but denied that he acquiesced in any repurchase or resale by Echo. Power contends the reasonably equivalent value of the items taken by Echo from the Power warehouse was never discussed, much less agreed upon by Echo and Power. Echo contends, however, that the parties agreed upon a reasonably equivalent value in section 8.3 of the distributorship agreement, and that it followed these provisions in crediting Power's accounts.[9]
The March 1985 and February 1988 collateral chattel mortgages provided for waiver of appraisal in conjunction with Echo and EFSI's right to executory process or other legal process. However, in obtaining and selling Power's inventory, Echo did not proceed by executory or other legal process. Thus, Echo's rights to a deficiency judgment in this case are not governed by the mortgage provisions that waived appraisement. Rather, Echo exercised its right to privately dispose of collateral, which was also authorized by the March 1985 and February 1988 collateral chattel mortgages. Those provisions authorized Echo and EFSI to assume the fiduciary role of attorney-in-fact in connection with their right to conduct a private sale of inventory. Absent from the private sale provisions were any terms relating to inventory valuation and the mortgagees' rights to deficiency, if any, following the disposition of Power's inventory.
The trial court found there was no evidence in the record of any agreement between Power and Echo as to the reasonably equivalent value of the property removed from Power's premises by Echo, noting that the values in the distributorship agreement were "fixed at the time of sale, not at the time of retransfer to Echo in payment of the debt." As to Scholl's November 1991 letter, the trial court concluded the letter was not a request for agreement on the terms of repurchase, but merely a statement of what Echo had decided to do and how it intended to *95 accomplish the inventory transfer. Although Butitta and his employees assisted in physically taking inventory and packaging, the trial court found Butitta never voluntarily consented to a complete or partial dation. In light of this evidence, the trial court held the exception provided for in LSA-R.S. 13:4108.1 was not applicable in this case.
We agree. Although Butitta probably would have agreed to a complete dation, that obviously did not occur, or this litigation would not exist. There is nothing in the record to suggest Power and Echo came to terms on a partial dation. Regarding an establishment of reasonably equivalent value for the returned Echo products, the distributorship agreement, although it contained repurchase terms and prices, was not part of a "work-out" agreement between Echo and Power, as envisioned by LSA-R.S. 13:4108.1. See Citizens Savings & Loan, 622 So.2d at 665. Butitta did not acknowledge or accept the terms of the termination letter, although he acquiesced in the transfer of Power's inventory back to Echo. Because there is no evidence the parties entered into any agreement in connection with Power's surrender of the inventory, we find no error in the trial court's determination that the exception pertaining to deficiency judgments in LSA-R.S. 13:4108.1 was inapplicable in this case.
Therefore, Echo would have been entitled to a deficiency judgment against Power on the mortgage debt only if (1) Chapter 9 of the Louisiana Commercial Laws (LSA-R.S. 10:9-502 through 9-509) applied in this case or (2) the provisions of LSA-R.S. 13:4106 were strictly complied with when the mortgaged property was sold.

D. Chapter 9 of the Louisiana Commercial Laws
Echo argues the trial court erred in concluding the voluntary return of inventory by Power triggered the provisions of the Deficiency Judgment Act. Instead, it directs this court's attention to the provisions of Chapter 9 of the Louisiana Commercial Laws concerning a default under a security agreement in a commercial transaction.
Currently, LSA-R.S. 10:9-503 provides that, after default, a secured party may sell goods that are in its possession or that have been voluntarily delivered or surrendered to him by the debtor, either before or after default. LSA-R.S. 10:9-504 describes the rights of a secured party to sell, lease, or otherwise dispose of all collateral and in subsection 2, provides:
If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency....
LSA-R.S. 10:9-504(3) permits collateral to be sold by public or private sale, with or without prior appraisal, as a unit or in parcels and at any time or place and on any terms, provided such sale is conducted in good faith and in a commercially reasonable manner. Furthermore, certain presumptions are imposed on the activities of the parties. LSA-R.S. 10:9-505(4) provides:
The debtor's abandonment or surrender to the secured party of goods, other than consumer goods, subject to a security interest, that is made after or in contemplation of the debtor's default, shall be deemed to be a surrender for purposes of sale pursuant to the provisions of this Part, with full reservation of deficiency rights, in the absence of written agreement to the contrary made substantially contemporaneously with or after such surrender.
Relying on these provisions, Echo argues the clear statutory language imposes an irrebuttable presumption that a surrender of goods to a secured party is for the purpose of sale and that, with respect to commercial goods, deficiency rights are preserved. This is true only if the provisions of Chapter 9 apply under the facts of this case.
The collateral chattel mortgages from which Echo derives its rights predate the effective date of Chapter 9, January 1, 1990.[10] By the legislature's enactment of LSA-R.S. 10:9-605, Echo argues these chattel mortgages *96 are deemed to have been expressly made in contemplation of being governed by Chapter 9 and became effective to create a security interest without further agreement when Chapter 9 became effective. LSA-R.S. 10:9-605 states:
Security agreements entered into before the effective date of this Chapter are expressly made in contemplation of being governed by this Chapter and shall become effective to create a security interest when this Chapter becomes effective, without further agreement. Filing with respect to such security interests may only be made on or after the date this Chapter becomes effective, and perfection of such security interests shall occur when the requirements for such perfection under this Chapter have been met, on or after the date this Chapter becomes effective.
However, in addition to LSA-R.S. 10:9-605, the legislature enacted other transition rules to govern the applicability of Chapter 9 relative to existing security rights. LSA-R.S. 10:9-601 et seq. The term "existing security right" is defined in LSA-R.S. 10:9-601(1), and the collateral chattel mortgages executed by Power satisfy this definition. With regard to existing security rights, LSA-R.S. 10:9-602(A) provides:
An existing security right continues to be governed in all respects by pre-Chapter 9[11] law until the existing security right is extinguished and the rights of the parties or all other persons affected by, dependent upon, or arising from such existing security right are finally determined and fixed. An existing security right continues without extinction, interruption, or a change in rank or priority in accordance with pre-Chapter 9 law, including but not limited to a mortgage of movables or immovables that secures a collateral mortgage note, a collateral chattel mortgage note, or other obligation that is pledged or in which an existing security right has been established. (Footnote added.)
In conjunction with the enactment of Chapter 9, the Deficiency Judgment Act and related articles of the Louisiana Code of Civil Procedure were amended by 1989 La.Acts No. 137, which states the legislative intent as follows:
It is the intent of the Legislature in enacting this Act to amend the preexisting Louisiana security device laws to accompany and accommodate implementation of Chapter 9 of the Louisiana Commercial Laws (R.S. 10:9-101, et seq.) as previously enacted under Act 528 of 1988. It is further the intent of the legislature that these preexisting Louisiana laws, including without limitation the various statutes and code articles amended and reenacted under this Act, not be expressly or impliedly repealed by Chapter 9 of the Louisiana Commercial Laws, but that such laws remain in effect and be applied to preexisting secured transactions and, at times when so provided, be applied to secured transactions subject to Chapter 9 of the Louisiana Commercial Laws.
1989 La.Acts No. 137, § 20.
In order to have certain provisions of Chapter 9 govern an existing security right, LSA-R.S. 10:9-602(B) authorizes the parties to an existing security right to enter into a written agreement after January 1, 1990 to the effect that:
the debtor's abandonment or surrender of the collateral to the secured party after default will be deemed to constitute the granting of a possessory security interest in such collateral under this Chapter entitling the secured party at its option to exercise the rights provided in R.S. 10:9-503, 9-504, or 9-505.
There is no evidence that such an agreement was entered into in this case.
Since the transitional provisions allowing the parties to have the default provisions of Chapter 9 govern the collateral chattel mortgages in favor of Echo and EFSI, which were existing security rights, were not utilized *97 by Echo or EFSI in this case, we conclude the provisions of Chapter 9 relied on by Echo are not applicable. Furthermore, when read in conjunction with the other transition rules, LSA-R.S. 10:9-605 clearly applies only to those Chapter 9 security agreements that were drafted in contemplation of being governed by this Chapter, but prior to its effective date, and does not apply generally to all existing security rights.
This court recognizes Power executed a security agreement in favor of EFSI on January 25, 1988, which granted EFSI all rights available under the U.C.C. in the event of Power's default. Louisiana did not adopt the U.C.C.; it adopted a modified version of article 9 of the U.C.C., which was approved by the governor on July 8, 1988, but ultimately did not become effective until January 1, 1990. See LSA-R.S. 10:9:101 et seq. Since the security agreement in favor of EFSI was executed prior to enactment of LSA-R.S. 10:9:101 et seq., we conclude it was not drafted in contemplation of being governed by Chapter 9, as required by LSA-R.S. 10:9-605, particularly when considering that the parties also executed a collateral chattel mortgage and note, which were pledged to secure Power's floor plan financing debt.[12]
Perhaps more important in this case is the fact that EFSI did not foreclose on its security; only Echo participated in the termination decision, return of goods, and crediting of accounts. The testimony of Gibson was quite clear in this regard. EFSI was not consulted when the decision was made to discontinue financing Power's purchases of Echo's products. EFSI had nothing to do with the series of events that culminated in credits to eliminate the principal balance on its floor plan account; Echo made those decisions without any input from EFSI. Echo did not formally acquire any of EFSI's rights until those were transferred to it after this litigation began. That transfer, which occurred long after the property was surrendered and sold at private sale, cannot retroactively inure to Echo's benefit to bring it under whatever U.C.C. umbrella the EFSI security agreement might have contemplated.
We conclude, therefore, that Chapter 9 of the Louisiana Commercial Code was not applicable to the surrender and re-sale of Power's goods in this case, and Echo did not derive any additional or alternative rights from its provisions.

E. Application of LSA-R.S. 13:4106
Since Echo's rights to a deficiency judgment were not governed by Chapter 9, its entitlement to a deficiency judgment on the mortgaged debt must be governed by the provisions of LSA-R.S. 13:4106. Although, facially, the Deficiency Judgment Act only applies to judicial sales, the jurisprudence has extended its protections to private sales. University Properties Corporation, 500 So.2d at 894. Under the stringent public policy provisions of the Deficiency Judgment Act as interpreted by prior jurisprudence, a mortgage creditor is absolutely barred from a deficiency judgment where he provokes a sale, judicial or private, without the benefit of appraisement. University Properties Corporation, 500 So.2d at 906. Those stringent provisions can only be avoided if the creditor carries its burden of showing it acted in good faith, the agreement was consented to by the debtor, and the agreement benefited the debtor. University Properties Corporation, 500 So.2d at 907.
Thus, in view of Echo's private sale without appraisal, to which Power did not consent, this court agrees that the debt secured by the collateral mortgages was completely discharged and no deficiency could be claimed by Echo with regard to the mortgage debt. See University Properties Corporation, 500 So.2d at 907. The trial court's ruling to this effect was legally correct.

Debt Due to Distributor Recourse Agreement
The trial court did not separately discuss any obligation Power might have owed as a *98 result of the recourse agreement. However, by ruling Echo and EFSI had forfeited all rights to a deficiency judgment, the court implicitly included any rights Echo or EFSI might have had by virtue of this agreement. We review the record to determine whether that judgment is legally correct.

A. Documents
With respect to the floor plan financing, EFSI required Power to execute a recourse agreement in its favor. This agreement was in letter form and dated February 8, 1988. Paragraphs 8 and 9 of the recourse agreement provided, in pertinent part:
8. If any dealer or other party liable for the Dealer Obligation of that dealer, including, but not limited to, any guarantor or surety, has failed to comply with any obligation contained in the Collateral Documents including, but not limited to, the obligation to make payments to [EFSI], or if [EFSI], at any time in [its] sole judgment, feel[s] that the Dealer Obligation of a dealer is or may become uncollectible in whole or in part for any reason or is or may become unenforceable in whole or in part for any reason, then thirty (30) days after demand by [EFSI], [Power] will absolutely, unconditionally, irrevocably and without limitation, purchase the Dealer Obligation and shall pay to [EFSI] the total amount of such Dealer Obligation at the time of purchase, including, but not limited to, principal, interest charges, costs, expenses and attorneys' fees.
9. [Power's] obligation to purchase the Dealer Obligation of any dealer in default shall be unconditional, absolute and irrevocable and shall not be subject to reduction, setoff, counterclaim, charge, crossclaim, defense or recoupment and shall not be affected by any action whatsoever taken or not taken by [EFSI] against the dealer or any ... person, corporation or other party liable for or whose property is liable for the Dealer Obligation or against any collateral held by [EFSI] to secure that Dealer Obligation. [Power] understand[s] that prior to making demand for payment by [Power], [EFSI] may commence collection efforts which, in [EFSI's] opinion, are reasonable. [Power] understand[s] that [EFSI is] not required to commence legal proceedings against any dealer and [Power's] liability shall not be affected by any settlement, compromise, adjustment, extension or variation of the terms which [EFSI] may grant to [Power's] dealer, nor by any action or omission by [EFSI] with respect to any Dealer Obligation.
In August 1992, Echo acquired whatever rights EFSI had under this agreement.

B. Application of Law to Facts
Echo's right to recover is governed by paragraphs 8 and 9 of the recourse agreement. Paragraph 8 obligated Power to purchase the dealer obligation if EFSI, at any time in its sole judgment, felt that the dealer obligation of a dealer was or might become uncollectible in whole or in part for any reason or was or might become unenforceable in whole or in part for any reason. To trigger such obligation, EFSI was required to make demand on Power. Although there is no evidence in the record before us that any such demand was made, the filing of the lawsuit might serve that function. However, in light of the decision we reach on this issue, we pretermit discussion of whether there was any demand sufficient to trigger Power's obligations under the recourse agreement.
On February 8, 1988, Power executed a $1,000,000 collateral chattel mortgage note, secured by a collateral chattel mortgage on its inventory of Echo products. The "Act of Pledge of Collateral Chattel Mortgage Note" dated February 15, 1988, indicated this note was pledged by Power to EFSI as security for the payment of any and every debt, liability and obligation, however evidenced, whether any such debt, liability or obligation was due or to become due, direct or indirect, absolute or contingent, whether now existing or to arise hereafter, owed by Power to EFSI.
Power's indebtedness for dealer obligations under the recourse agreement is one of the obligations secured by these documents. Because this debt is among those for which Echo and EFSI are barred from obtaining a deficiency judgment, we conclude the trial court did not err in finding this *99 portion of Power's debt also is considered as fully satisfied and Power is discharged from paying whatever might have been owed under the recourse agreement.

K & D Accounts Receivable
In addition to the suit against Power for debt owed on open account, floor plan financing and dealer obligations pursuant to the recourse agreement, Echo filed suit against K & D, seeking to have judgment entered on the assigned accounts receivable for the amounts owed to Power by K & D. These receivables, among others, were assigned to Echo to secure Power's debt; this was not a separate debt owed by K & D to Echo. Since all Power's debt was secured by the collateral chattel mortgages and Echo is barred from recovering any deficiency owed on the mortgage debt, its rights under the assignment of accounts receivable are irrelevant in this case.

Wrongful Seizure of Inventory
Power claims the trial court committed reversible, legal error in failing to award it damages for wrongful seizure and tortious conversion in an amount equal to the replacement costs of its misappropriated inventory. It contends a wrongful seizure occurred when Echo took its inventory at the end of 1991 without waiting for the termination date, additional notice, or resort to legal process.
It is well settled that when goods are repossessed without judicial process the consent of the owner must be shown by the seizing creditor in order to avoid legal liability. Cook v. Spillers, 574 So.2d 464, 467 (La.App. 2nd Cir.1991). A default in payments by the plaintiff does not justify the repossession by the defendants' agent without resort to proper legal process unless the plaintiff voluntarily consents to the method of repossession. Cook, 574 So.2d at 467. This consent must be proved as any other fact tending to show a state of mind. Where it is not expressly given, orally or in writing, it may be inferred from actions which, when considered with one's words and all other circumstances, can lead to no other reasonable conclusion. Cook, 574 So.2d at 467. But if the circumstances and words do not strongly imply consent to reasonable minds, it shall not be found. Mere inaction or the absence of protests to the taking does not imply consent. Furthermore, the consent given to the seizure must be that of the debtor. Cook, 574 So.2d at 467.
In the present case, although no signed act of voluntary surrender or release was executed, at trial the parties stipulated that Power surrendered its remaining stock of inventory in December 1991. A stipulation has the effect of a judicial admission or confession, which binds all parties and the court. Stipulations between the parties in a specific case are binding on the parties when not in derogation of the law. R.J. D'Hemecourt Petroleum, Inc. v. McNamara, 444 So.2d 600, 601 (La.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984). In light of this stipulation and the right to private sale as authorized by the collateral chattel mortgages, we find no error in the trial court's failure to award damages in Power's favor for wrongful seizure of inventory and tortious conversion.

Admissibility of Evidence
Echo contends the trial court erred in excluding from evidence certain accounting records that accurately portrayed the sums due to Echo by Power. In light of our ruling on Echo's right to a deficiency judgment, we find it unnecessary to address this issue.

Decree
For the foregoing reasons, the trial court judgment is affirmed. Each party is responsible for its own appeal costs.
AFFIRMED.
CARTER, J., concurred.
NOTES
[1] References in the record are imprecise, but we conclude Echo is a wholly owned American subsidiary of a Japanese corporation, Mitsui & Co.
[2] Apparently Mitsui & Co. Financial Services, Inc. is also a wholly owned American subsidiary of Mitsui & Co., and a minority shareholder in Echo. The administration of the EFSI floor plan was handled initially by American Acceptance Corp., and later by Chrysler First, under Echo's supervision.
[3] On August 27, 1992, Echo and EFSI executed a "Purchase, Assignment and Security Agreement," which transferred all of EFSI's accounts, security interests, distributor's recourse liability, and instruments to Echo. Thus, the trial court sustained Powers' exception raising the objection of no right of action and dismissed Mitsui, doing business as EFSI, as a party plaintiff in the main demand.
[4] In its brief, Echo stated the time had long passed to bring suit over a computer dispute known to the parties at least since 1987. By this statement, Echo seemingly raises the issue of prescription. Since this issue was not raised by a pleading filed originally with this court in compliance with Rule 2-7.2 of the Uniform Rules of Louisiana Courts of Appeal, it is not properly before this court. Thus, we pretermit discussion of the issue of prescription. Echo also did not assign as error the trial court's factual finding that Echo required Power to purchase a particular computer system, so we do not review that finding.
[5] In fact, Butitta contended Echo verbally agreed to continue the forgiveness of interest indefinitely, as long as he received no salary from Power, thus minimizing Power's operating expenses. This contention is belied by writings from Butitta asking Echo to waive some $96,000 in interest which had accrued on Power's open account at that point; such a request would have been unnecessary if both parties understood there would be an indefinite waiver of interest. Moreover, the trial court concluded any such agreement would have been unenforceable because it contained a potestative condition dependent wholly on the whim of the obligor, Power, which would never be exercised because to do so would have a disastrous effect on Power's financial status and ability to continue in operation.
[6] The witnesses variously referred to these charges as "interest" or as "delinquency charges." The charges did not begin to accrue on open account immediately. There was a "grace period" of several months on all charges, to give the distributorship the opportunity to re-sell the product and remit payment to Echo. After this time period, the account was considered "delinquent" and interest charges accrued.
[7] LSA-C.C.P. art. 2723 was amended by 1989 La.Acts No. 137, which became effective on September 1, 1989.
[8] A dation (giving in payment) is an act by which a debtor gives a thing to the creditor, who is willing to receive it, in payment of a sum which is due. LSA-C.C. art. 2655. In a dation, ownership is transferred by delivery. LSA-C.C. art. 2656. However, unilateral delivery of property by the debtor to his creditor will not perfect a dation; there must be consent by the creditor. In the dation, the consideration is the remission of the preexisting debt. A perfected dation ordinarily will extinguish the entire debt. University Properties Corporation, 500 So.2d at 893. Where the entire obligation has been extinguished by the dation, there can be no valid suit for a deficiency judgment. University Properties Corporation, 500 So.2d at 893-894. However, parties validly may enter into a dation for a partial remission of the debt obligation. University Properties Corporation, 500 So.2d at 894.
[9] Section 8.3 provides, in pertinent part:

Obligations Upon Termination. In the event that this Agreement is terminated in its entirety or with respect to any line of Products, [Echo] shall have the right but not the obligation to repurchase from [Power] all or any portion of any new, undamaged, and unused Products related to the line or lines of Products terminated, which are of current manufacture in their original containers, theretofore sold by [Echo] to [Power] and being currently offered for sale by [Echo], and owned by and remaining in [Power's] inventory, at the lower of the prevailing or original purchase prices exclusive of any transportation charges originally paid by [Power] and less any non-reimbursed transportation charges originally paid by [Echo].
[10] Chapter 9 of the Louisiana Commercial Laws, LSA-R.S. 10:9-101 et seq., was enacted by 1988 La.Acts No. 528.
[11] As used in LSA-R.S. 10:9-601 et seq., "pre-Chapter 9 law" means all laws in effect immediately preceding 12:01 a.m., January 1, 1990, including those laws pertaining to the substantive effect, formal requirements, effectiveness between the parties, effectiveness as to third persons, priority, inscription, reinscription, prescription, interruption of prescription, enforcement, and extinction. LSA-R.S. 10:9-601(2).
[12] Additional support for the conclusion that Louisiana's adoption of Chapter 9 of the U.C.C. was not contemplated by this agreement is the statement in paragraph 22 of the security agreement that "all references to the `Uniform Commercial Code' shall refer to the Uniform Commercial Code in effect in the Commonwealth of Pennsylvania."